FILED

FEB 2 5 1992

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    - - -

4    BEFORE THE HONORABLE WILLIAM J. REA, JUDGE PRESIDING

5    - - -

6    91-80165

7

8    UNITED STATES OF AMERICA,    )
                                  )
9         Plaintiff,              )
                                  )
10   vs.                          )    CR-88-129-WJR
                                  )
11   JUAN RAMON MATTA,            )
                                  )
12        Defendant.              )
     _____)

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              JURY TRIAL (15TH DAY)

17           TUESDAY, OCTOBER 23, 1990

18

19

20

21

22              VERNA R. MORON
                COURT REPORTER PRO TEM
23              U.S. DISTRICT COURT HOUSE
                312 NORTH SPRING STREET
24              LOS ANGELES, CALIFORNIA 90012
                (213) 894-3015
25

i

## I N D E X

Colloquay                                                3
Side Bar                                                30
Motion                                                  33
Ruling                                                  99


### WITNESSES

Bille Wendel Perkins

Direct Examination by Mr. Kenaty                          3
Voir Dire by Mr. Stolar                               5, 7
Direct Examination by Mr. Kenaty, Cont'd.            7, 11
Voir Dire Examination by Mr. Kenaty                      9
Cross-examination by Mr. Stolar                         16

Jose Manuel Martinez-Morales

Voir Dire Examination by Mr. Connolly                   71
Voir Dire Examination by Mr. Stolar                     88
Direct Examination by Mr. Connolly                     102

### EXHIBITS

Exhibit 57                                             5-6
Exhibit 58                                            6-11
Exhibit 14                                           13-14
Grand Jury Testimony                                 15-16
Summary                                                 73
Summary                                              95-97
Summary                                              98-99
Exhibit 71                                         105-107
Exhibit 59-A                                           120
Exhibit 59-B                                           120

3

1  LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 23, 1990.

2                    (TRIAL CONTINUES).

3            THE COURT:   All right.   Is there going to be

4  any documents filed relating to the matter that was

5  handed tome this morning?

6            MR. KENATY:   Yes, Your Honor.   The Government

7  just filed something about five minutes ago.

8            THE COURT:   That answers my question.   Let's

9  proceed, shall we?

10                   (JURY PRESENT).

11           MR. KENATY:   Your Honor.

12           THE COURT:   Who is your next witness?

13           MR. KENATY:   Billie Perkins, Your Honor.

14  BILLIE WENDELL PERKINS, PLAINTIFF'S WITNESS, SWORN.

15           THE COURT CLERK:   Please state your full name,

16  and spell it for the record.

17           THE WITNESS:   Billie Wendell Perkins, B-i-l-l-

18  i-e  W-en-d-e-l-l  P-e-r-k-i-n-s.

19  DIRECT EXAMINATION BY MR. KENATY:

20  Q    Mr. Perkins, where do you live?

21  A    I'm sorry?

22  Q    Where do you live?

23  A    I live in Woodland Hills.

24  Q    What kind of work do you do?

25  A    Computers - computer sales.

4

1    Q    In the fall of '83, did you own a condo in Reseda?

2    A    Yes, I did.

3    Q    And what was the address of that condo?

4    A    Sorry.  I can't remember.

5    Q    Do you remember what street it was on?

6    A    Yes.  It was on Sherman Way.

7    Q    How would you describe the physical layout of that

8    condo?

9    A    Physical layout, it was a center unit facing the

10   swimming pool, four levels.  Five, counting the garage;

11   three bedrooms, two and a half baths.

12   Q    Would it be appropriate to describe it as a

13   townhouse?

14   A    Yes.  It was a townhouse.

15   Q    And is the garage part of the unit?

16   A    Yes, it was.

17   Q    Would one be able to go directly from the house to

18   the street (ph)?

19   A    Yes.

20   Q    Now, did there come a time when you no longer lived

21   there?

22   A    Yes.

23   Q    What did you do with the property?

24   A    I went to a realtor and put it on the market to

25   rent.

5

1        MR. KENATY:    I ask that the Clerk show the

2   witness, Government's Exhibit 57.

3        THE COURT CLERK:    Government's Exhibit 57 is

4   placed before the witness.

5        MR. STOLAR:    Your Honor, could the witness put

6   the microphone a little closer to his mouth?

7        THE COURT:  Sure.

8        THE COURT CLERK:    Government's Exhibit 57,

9   placed before the witness.

10   Q    Do you recognize that, Mr. Perkins?

11   A    Yes, I do.

12   Q    What is that?

13   A    It is a picture of the townhouse I owned.

14   Q    Does it appear in that picture to be in substan-

15   tially the same condition as it was in 1983?

16   A    The people who have it now put in better drapes.

17        MR. STOLAR:  May I ask a question or two?

18        THE COURT:  Yes.

19   VOIR DIRE EXAMINATION BY MR. STOLAR:

20   Q    Did you take that photo?

21   A    No, I did not.

22   Q    Do you know when it was taken?

23   A    I'm not sure.

24   Q    Is it fair to say that it's not the house --

25   it is not a picture of the house taken back in 1983, is

6

1    it?

2    A    Now, it is not.

3    Q    How does it differ?

4    A    The drapes.

5    Q    That's it?

6    A    That's it.

7          MR. STOLAR:  No objection.

8          THE COURT:  It will be received.

9    DIRECT EXAMINATON BY MR. KENATY, CONT'D:

10   Q    Was the rental agent with whom you listed the

11   property able to rent it?

12   A    Yes, she was.

13         MR. KENATY:  I ask that the witness be shown

14   Exhibit No. 58.

15         THE COURT CLERK:  Government's Exhibit 58

16   placed before the witness.

17   Q    Mr. Perkins, do you recognize that?

18   A    Yes, I do.

19   Q    And do you recognize anyone's signature on it?

20   A    I recognize my signature.

21   Q    Could you tell the Court what it is?

22   A    It is a lease for the townhouse on Sherman Way.

23         MR. KENATY:  Your Honor, I ask that that be

24   admitted into evidence?

25         MR. STOLAR:  May I --

7

1    THE COURT:  I don't know, at this point, how

2    relevant it is to the issues in the case.

3    MR. KENATY:    Once it is admitted into

4    evidence, and he can tell what is in it --

5    THE COURT:  Have you seen the exhibit?

6    MR. STOLAR:  I have seen it.

7    THE COURT:  Do you have a question?

8    MR. STOLAR:  Yes, I do.

9  VOIR DIRE EXAMINATION BY MR. STOLAR:

10  Q    You didn't handle the negotiations to obtain that

11  lease, did you?

12  A    It was through a third party.

13  Q    A man named Jerry Burns?

14  A    No.  It was a lady.  She may have worked for this

15  realtor's company.

16  Q    And did you ever meet the tenants?

17  A    Yes, I did.

18  Q    Did you see the tenants sign the lease?

19  A    No, I did not.

20  Q    Do you know the tenants' signature, other than what

21  appears to be on the lease?

22  A    No, I do not.

23  Q    How long after the lease -- well, prior -- back in

24  1983, did you actually see that lease or have it in your

25  possession?

8

1   A    Yes, I did.

2   Q    When did it come into your possession?

3   A    The realtor brought it to me for my signature.

4   Q    And you retained a copy or the original?

5   A    Yes, I did.

6   Q    But you never met the persons who signed it, did

7   you?

8   A    Not until they moved in.

9   Q    Did they acknowledge to you ever, that they did

10  sign the lease?

11  A    Yes, they did.

12  Q    When did they do that?

13  A    When we talked about the six months, rather than

14  the 12 month lease.

15  Q    And is that a six or 12 month lease?

16  A    This is a six month lease.

17  Q    Did the person who was the tenant say to you, "yes,

18  that's my signature on the lease?"

19  A    No.

20          THE COURT:   Wait just a minute.  Did you ask

21  him if it was his signature?

22          THE WITNESS:   When I first met him, he thanked

23  me for approving the six month lease, rather than a 12

24  month lease.

25          THE COURT:   But you didn't say, "is that your

9

1    signature?"

2              THE WITNESS:  No, I did not.

3    Q    Is there a printed name beneath the signature?

4    A    No, there is not.

5    Q    What is the term on the lease?

6    A    The term on the lease is for six months.

7    Q    Okay.  From what to what?

8    A    From May 28th -- I'm sorry; November 28th of '83 to

9    May of '84.

10   Q    And other than the -- there was somebody living in

11   the house who paid the rent, right?

12   A    Yes, a man (ph).

13   Q    But you cannot tell us, whether the male person who

14   paid the rent signed the lease, right?

15   A    Obviously.

16             MR. STOLAR:  There is an objection.

17             MR. KENATY:  Your Honor, can I conduct a voir

18   dire?

19             THE COURT:  Yes.

20   VOIR DIRE EXAMINATION BY MR. KENATY:

21   Q    What is the name on the lease?

22   A    "Tomás Suardez, S-u-a-r-d-e-z."

23   Q    Could we assume that is "Suarez?"

24   A    Yes.

25   Q    The person who lived in the apartment in the town-

10

1    house, did he identify himself by name to you?

2    A    Yes, he did.

3    Q    What did he say his name was?

4    A    "Tomás."

5    Q    And how often did you meet him?

6    a    Approximately three times.

7    Q    Did he pay the rent every month?

8    A    Yes, he did.

9    Q    Did he pay it in person?

10    A    Yes, he did.

11    Q    And how many months did he stay there?

12    A    Stayed about seven or eight months.

13    Q    So would you have met him five or six times?

14    A    No. He would bring the rent over to my house, and

15 on several occasions, my wife received the money.

16        THE COURT: On other occasions, you received

17 it?

18        THE WITNESS: Yes, I did.

19        THE COURT: And he handed it to you?

20        THE WITNESS: Yes, sir.

21    Q    On any of those occasions, did he ever do anything

22 to disabuse you of your belief that he was Tomás Suarez?

23    A    No, he did not.

24    Q    Did he ever do anything to disabuse you of your

25 belief, that he was the man who signed the lease?

11

1   A    No, he did not.

2   Q    And did he discuss with you the possible extension

3   of the lease?

4   A    Yes, he did.

5   Q    During those conversations, did he refer to the six

6   month lease he currently held?

7   A    Yes, he did.

8   Q    During that time, did he do anything to disabuse

9   you of the notion, that he indeed was the man who had

10  signed that six month lease?

11  A    As far as I knew, he was the man who signed the

12  lease.

13          MR.  KENATY:    Your  Honor,  I  offer  it  in

14  evidence.

15          THE  COURT:    The objection is overruled.    It

16  will be received.

17  DIRECT EXAMINATION BY MR. KENATY, CONT'D:

18  Q    Now, how often did you say the man known to you as

19  "Tomás Suarez" continued to live there?

20  A    As best as I can recall, seven or eight months.

21          MR.  KENATY:    Your  Honor,  I'm  now  in  the

22  position of  asking  the  Clerk,  to  show  Mr.  Perkins

23  Exhibit 14.

24          THE  COURT:    She had to take care of another

25  urgent matter.    Can you move along to another line of

12

1    questions?

2        MR. KENATY:   Yes, Your Honor.

3    Q    Did there come a time, when the man known as Tomás

4    Suarez no longer paid the rent?

5    A    Yes.

6    Q    And could you tell the members of the jury what

7    happened?

8    A    My wife told me that a new individual came to pay

9    the rent, and that he frightened her.  He was a very

10   rough   looking   individual;   spoke   extremely   broken

11   English, and just had an aura of fear about him.  And

12   she wanted me to start investigating whether or not

13   Tomás was still there.  He identified himself as Tomás's

14   cousin.

15   Q    Did there come a time when you yourself met this

16   rough looking individual?

17   A    Yes.  I proceeded to call, and find out what was

18   going on at the townhouse.  And the next month, the same

19   individual came to the house.  And I agreed with my wife

20   that something was amiss.

21   Q    And did you then terminate the lease?

22   A    Yes.  I notified him that I would be bringing in a

23   realtor to place the unit up for sale, and I wanted to

24   come in for an inspection.

25   Q    Did you ever see the man known to you as "Tomás

12a

1   Suarez" again?

2   A    No, I did not.

3           MR. KENATY:    Ms. Dillard, could you show the

4   witness, Exhibit 14?

5           THE COURT CLERK:    Government's Exhibit 14,

6   placed before the witness.

7   Q    Mr. Perkins, does that look like the man know to

8   you as "Tomás Suarez?"

9   A    Yes, it does.

10  Q    And did he tell you why he wished to rent your

11  townhouse?

12  A    Yes.  I was told that he was in town for six months

13  of flight training, to work for his father's air line in

14  Mexico.

15  Q    How far is your property from Van Nuys Airport?

16  A    Three or four miles.

17  Q    Mr. Perkins, would it be fair to say, that the man

18  in that photograph, looks like Mr. Suarez, but you're

19  not sure?

20  A    That is correct.

21  Q    What time did Mr. Suarez or his rough looking

22  cousin vacate your property?

23          MR. STOLAR:    Objection, Your Honor.  We don't

24  know if it is his cousin; assumes a fact not in

25  evidence.

13

Q    What time did Mr. Suarez or the man who identified himself as Mr. Suarez's cousin vacate your property?

A    Very shortly after I notified him that I was bringing a realtor over to appraise the property.

Q    Can you tell us what year and month that was?

A    I'm sorry.  I don't have any record.

Q    Could you perhaps look at your lease, and see if that refreshes your recollection as to the time involved?

A    It would have been around July, August.

Q    Of what year?

A    '84.

Q    You -- how did the man known to you as "Tomás Suarez" pay the rent?

A    On a monthly basis.

Q    In what form?

A    Cash.

Q    Did he always pay it in cash?

A    Yes.

Q    Did there come a time, when you asked him for a check?

A    Yes.

Q    And what did he say?

A    He said that -- for the first month, I didn't feel that it was unusual, since he had just moved up here.

14

1   The second month, he said he didn't have an opportunity

2   to open a checking account.  And after that, it -- I had

3   the impression that his father was sending him a monthly

4   allowance.

5   Q    Mr. Perkins, did he ever tell you that he did get a

6   checking account?

7   A    No, he did not.

8   Q    Did you find out, through your own investigation,

9   that he indeed had a checking account?

10  A    Yes.

11  Q    Could you tell the members of the jury how you

12  found that out?

13  A    Certainly.  At some point - and I do not recall the

14  date - but the DEA had pulled a raid on the townhouse.

15  I had been over, and  I found a search warrant in the

16  middle of the floor.

17        In discussing it with the DEA - what happened, etc.

18  - in the process of having the place cleaned out, I went

19  over to the mail box, opened the mail box, and it was

20  full of mail.  Some of the mail I noticed in there were

21  bank statements.

22  Q    Mr. Perkins, do you recall testifying in front of a

23  grand jury in this Court House on December 17, 1987?

24  A    Yes, I do.

25        MR. KENATY:   Your Honor, I'm going to show

15

1    -- to ask to show the witness's testimony to him, to see

2    if it refreshes his recollection with respect to a

3    certain incident.

4             MR. STOLAR:    He hasn't said he doesn't

5    remember --

6             THE COURT:    You haven't laid the foundation

7    for the use of it at this point.

8             MR. KENATY:    Your Honor, I'm just telling you

9    where I'm going.

10            THE COURT:    See if he needs his memory

11   refreshed.

12            MR. KENATY:    Yes, I understand.

13   Q    You testified earlier, that you were not sure

14   exactly when the people moved out of your apartment -

15   your apartment on Sherman Way, is that correct?

16   A    That's correct.

17   Q    Would it help refresh your recollection, were I to

18   show you your grand jury testimony?

19   A    Very possible.

20            MR. KENATY:    May I have it marked, Your Honor?

21            THE COURT:    Give us the page and line number.

22            MR. KENATY:    Page 7, starting on Line 15.

23            THE COURT:    All right.    Why don't you show it

24   to the witness.

25            (HANDED TO THE WITNESS).

16

1          THE COURT:  Read it to yourself, Mr. Perkins.

2          THE WITNESS: Yes, sir.

3     Q     Mr. Perkins, does that refresh your recollection?

4     A     Certainly.

5     Q     Are you able to now give us a more definitive

6     answer as to what time your townhouse was vacated?

7     A     Yes, on 2/4/85.

8          THE COURT:  When?

9          THE WITNESS:  2/4/85 - February.

10    Q     And Mr. Perkins, was that incident fresh in your

11    memory at the time you testified in front of the Grand

12    Jury?

13    A     Certainly.

14         MR. KENATY:  Your witness.

15    CROSS-EXAMINATION BY MR. STOLAR:

16    Q     Good morning, Mr. Perkins.

17    A     Good morning.

18    Q     In connection with your renting the house, there

19    was also a credit application filled out, wasn't there?

20    A     A credit check?  I didn't.  It was run by the

21    realtor.

22    Q     Do you know what the results of that check were?

23    A     She told me it was good.

24    Q     Credit was good?

25    A     Yes.

17

1    Q    Did you ever see the credit application?

2    A    No, I did not.

3    Q    Did it become part of your records?

4    A    I do not recall.

5    Q    The way -- well, when you testified before the

6    grand jury -- you were subpoenaed to come before the

7    grand jury, were you not?

8    A    That's correct.

9    Q    And they also subpoenaed you to bring all your

10   records with you.

11   A    That's correct.

12   Q    And the way you remember - now - the date the

13   person moved out was by essentially referring to a check

14   stub, is that right?

15   A    Yes, it was.

16   Q    And -- I mean that was a check that your wife had

17   written, correct?

18   A    That's correct.

19   Q    For the return of the security deposit.

20   A    Correct.

21   Q    Now, how long after the lease was signed - and the

22   lease is 11/28/83 - how long was it after that, until

23   you met the person that was your tenant?

24   A    During the first month.

25   Q    Did he give you a security deposit and the first

18

1   month's rent?

2   A    No.  That was given to me by the realtor.

3   Q    And how much was the rent if you recall?

4   A    $900.00 a month.

5   Q    Did the realtor give you this in cash or check?

6   A    I don't recall.

7   Q    In any event, you did not get it directly from the

8   person, correct?

9   A    That's correct.

10  Q    And a person signs the lease, T-o-m-a-s  S-u-a-r-e-z,

11  is that right?

12  A    That is what is on the lease.

13  Q    Not "az" at the end of Suarez?

14  A    May I look?

15  Q    You may.

16  A    Appears to be "az."

17  Q    By the way, what do you do for a living now?

18  A    I sell computers.

19  Q    What kind?

20  A    Very large ones.

21  Q    What brand?

22  A    Harris Computer Systems.

23  Q    In -- when you were before the grand jury, would it

24  be fair to say, they showed you a spread of pictures?

25  A    That's correct.

19

Q    Roughly six photos, and asked if you could identify the man that was your tenant, correct?

A    That's correct.

Q    And which picture did you pick?  Do you recall?

A    I picked two.

Q    You picked two; both of them appeared to be the same man, right?

A    As I recall, my statement was that it could be one of the two.

Q    Okay.  So that the photo that is here is very clear; this looks like the man, but you can't give us any definitive answer that this is the man?

A    That's correct.

Q    This person who identified himself as the cousin, were you ever shown any pictures, and asked to try to identify who that person was?

A    No.

Q    They -- you never were curious about that?

       MR. KENATY:  Objection, Your Honor.

       THE COURT:  Sustained.

Q    Well, did you ever look at more than one photo spread?

A    I believe -- this is really testing my memory, but I believe I went through two sessions of looking through pictures.

20

1   Q    Was it in an effort to attempt to identify the

2   cousin, or --

3   A    It was an attempt to identify the woman introduced

4   to me as Tomás's wife.

5   Q    Do you remember what her name was?

6   A    No.

7   Q    And were you able to pick out a picture of her?

8   A    No.

9   Q    I believe you told us, that the man (ph) told you

10  in conversation -- that his father owned some type of

11  commercial air line in Mexico?

12  A    That's correct.

13  Q    Didn't he also tell you that his father had a large

14  ranch in Mexico?

15  A    Yes.

16  Q    And that he was quite wealthy?

17  A    Yes.

18  Q    And that he was a pilot, up here attending flight

19  school?

20  A    That is correct.

21  Q    Now -- for the first six months, did the rent get

22  paid on time?

23  A    Yes.

24  Q    Was it always paid in cash?

25  A    Yes, it was.

21

1    Q    Was that a particular problem for you?

2    A    Not really.

3    Q    What about after the first six months.  Did the

4    lease get extended?

5    A    On a month to month basis.

6    Q    And was there a conversation about that?

7    A    Yes, there was.

8    Q    Can you tell us what the conversation was?

9    A    The conversation was that he was going to continue

10   his training, and would like to go on a month to month

11   lease.  And at the time, I said, "fine."

12   Q    Did he speak English fluently?

13   A    Yes, he did.

14   Q    Any kind of an accent?

15   A    Yes.

16   Q    But fluent?

17   A    Fluent.

18   Q    No problem with him understanding you, or you

19   understanding him?

20   A    Not as I recall.

21   Q    So how long did the month to month lease go on?

22   A    Well, again, I haven't had my records for several

23   years, but obviously, it went on until February.

24   Q    Who has your records?

25   A    The grand jury.

22

1   Q    The prosecutors have them as far as I know.

2   A    I don't know.

3   Q    Did they show them to you before you testified?

4   A    Did they show them to me?

5   Q    Your own records - let you see them, so it might

6   refresh your recollection about what occurred.

7   A    Testifying today?

8   Q    Yes.

9   A    No.

10  Q    Did you sit down an talk to Mr. Kenaty or Mr.

11  Connolly?

12  A    Yes.

13  Q    When did you do that?

14  A    Saturday.

15  Q    Did they show you any records to refresh your

16  recollection about what happened six years ago?

17  A    I did see the lease.

18  Q    And that's it?

19  A    As I recall.

20  Q    Okay.  Did there come a time when Tomás or the

21  person you knew as Tomás stopped being the one who paid

22  the rent?

23  A    Yes.

24  Q    And roughly, when was that?

25  A    Roughly two to three months before we asked them to

23

1    -- that we were going to sell the place.

2    Q    That's when this rough man started coming over to

3    pay the rent, is that right?

4    A    Yes.

5    Q    Did you see Tomás at the house after that man

6    started paying the rent?

7    A    No, I did not

8    Q    So you can't really tell when Tomás left the house

9    -if indeed he left the house.

10   A    Other than phone conversations and returning my

11   calls, I have no idea.

12   Q    You had phone conversations with him during that

13   period?

14   A    Yes, I did.

15   Q    If you can recall, how long, prior to the February

16   4th date, when you went over there and found the search

17   warrant was your last conversation with the man -

18   the "man" being Tomás?

19   A    I recall I tried for a period of time to have Tomás

20   return my phone calls.

21   Q    But?

22   A    It took a period of time, and it was an aggravating

23   period of time.  I can't say how long it was.

24   Q    But the rent was still being paid?

25   A    That's correct.

24

1   Q    After -- well, what was it that caused you to go

2   over to the in February of '85?

3   A    They had informed my wife that they had moved out

4   - they had come over for the security deposit.

5   Q    Who is "they?"

6   A    Tomás, but the gentleman that came over -- I'm

7   sorry.   I can't recall who came over to ask for the

8   security deposit, but I was traveling at the time.   And

9   when I returned in town, I went over and investigated,

10  to see what the place looked like.

11  Q    And when you went over there, you found a copy of

12  the search warrant on the floor?

13  A    That's correct.

14  Q    And what kind of shape was the house in?

15  A    It was empty.

16  Q    Anything damaged?

17  A    The door.

18  Q    How was it damaged?

19  A    It was broken into.

20  Q    Did you subsequently find out whether it was Tomás

21  that broke down the door, or whether it was law

22  enforcement?

23  A    I assumed that it was law enforcement.

24  Q    Did you have any discussions with law enforcement

25  about it?

25

1   A    Yes, I did.

2   Q    And what did you find out?

3   A    That they had entered by force.

4   Q    Do you know if they arrested anybody then?

5   A    No, I don't know.

6   Q    Do you know if they found any drugs there?

7   A    No, I do not know.

8   Q    The mail in the mail box that you found, in whose

9   name was that?  Do you recall?

10  A    As I looked through it, Tomás's name.

11  Q    Did it say "Tomas Suares," spelled with an "s"?

12  A    I can't recall.

13  Q    Does the name "Tomás Suarez Coral" ring a bell?

14  A    I can't remember.  It was  a great deal of mail.

15  Q    Bank mail?

16  A    Bank.

17  Q    Personal?

18  A    Phone bills, car phone bills, storage bill, junk

19  mail - you know.

20  Q    Magazines?

21  A    No.  The mail box is too small.

22  Q    Now that you think about it, was his wife's name on

23  any of the mail?

24  A    I don't recall.

25  Q    What did you do with the mail if anything?

26

1    A    I  sent  it  into  the  DEA  Agents  that  were

2    investigating the case.

3    Q    Okay.  Do you remember which DEA Agents that was?

4    A    No, I do not.

5    q    Was it Bodell Hancock (ph)?

6    A    I don't recall.

7    Q    Subsequent to your finding the search warrant, did

8    you have any conversations with Tomás?

9    A    The conversations that I had with him was that I

10   was going to sell the place. He, at first said, "gee,

11   I'd like to buy it," and I said, "let me know, because

12   I'm going to bring the real estate agent in."

13   Q    And that is subsequent to your finding the search

14   warrant there?

15   A    That is correct.

16   Q    Did you have any discussions with him about the

17   fact that the police had broken into the house?

18   A    No.

19   Q    You didn't raise that with him?

20   A    He was gone.

21   Q    But this is a conversation you're having, right?

22   A    Yes.  This was during the final months of his stay

23   there.

24   Q    This is before the search warrant or after?

25   A    Before the search warrant.

27

Q    Did you ever have any contact with him, either personally or by telephone, subsequent to the search warrant?

A    No.

Q    But prior to that, he was looking -- or he did have conversations with you about wanting to buy the place. Is that right?

A    That's correct.

Q    And that never went any place.

A    No.

Q    Did this fellow, Tomás, give you the impression that he was a drug dealer?

A    No, he did not.

Q    Did he look like a drug dealer?

A    No, he did not.

Q    Now, what about the rough cousin? You said something about him was amiss. Did he give you the impression that he was a drug dealer?

A    The assumption -- I had not related it to drugs. The assumption I had, I related it to other people living in the place, and they better not be there; and it was a rough element staying in the place.

Q    What was rough about this man? Could you tell us?

A    His appearance, his dress.

Q    Unshaven or sloppy clothing; something like that?

28

1    A    I can't -- no, I don't think he was unshaven.   He

2    had a very rough complexion - spooky;  just a spooky

3    looking aura; he shouldn't be over there paying the rent

4    any way.

5    Q    Particularly because he frightened your wife?

6    A    He frightened my wife.

7    Q    Did he speak English?

8    A    Very broken.

9    Q    And you have not seen a picture of that person?

10   A    No, I have not.

11   Q    Finally, apparently your wife returned the security

12   deposit to them, right?

13   A    Yes.

14   Q    And do you know what name she made the check out

15   to?

16   A    I'm sure she made it out to Tomás.

17   Q    And she did that while you were out of town?

18   A    That's correct.

19   Q    And when you got back to town, you caused payment

20   to be stopped on the check?

21   A    Yes.

22   Q    Why was that?

23   A    Because I wanted to check the place out.

24   Q    Did your wife send the check to some place?

25   A    No.

29

1    Q    She just handed it to him, is that right?

2    A    That's correct.

3    Q    So you stopped payment, and went and checked the

4    place out, and you never gave them back the security

5    deposit, right?

6    A    We never heard from them again.

7    Q    Did you have an address from them?

8    A    No, I didn't.

9    Q    What kind of address did the credit application

10   list?

11   A     I don't recall if I saw it.

12   Q    Weren't you told by the realtor that he listed a

13   Guadalajara address on his credit application?

14   A    That's possible.

15   Q    Did you know the name of the air line that he said

16   he worked for?

17   A    No.

18   Q    Do you know if it was on the credit application?

19   A    I have no idea.

20          MR. STOLAR:  Thank you, sir.

21          MR. KENATY:  Nothing further, Your Honor.

22          THE COURT:  Mr. Perkins, you may step down.

23   You're excused.

24          MR. CONNOLLY:    Your Honor, the Government

25   calls Jose Manuel Martinez please.

30

1    MR. STOLAR:   May we approach on this, Your

2    Honor?

3          THE COURT:  Yes.

4                (AT THE SIDE BAR).

5          MR. STOLAR:   Two things, Your Honor.  First,

6    this is the beginning of what I suspect to be a number

7    of Spanish policemen, and I want to make sure that this

8    is not a fellow who is going to talk about wiretaps,

9    which is the subject of a motion.

10         MR. KENATY:   Yes, sir.  He is going to talk

11   about the wiretaps.

12         MR. STOLAR:   Then I would ask that you call

13   somebody to talk about surveillance or something of that

14   nature - not wiretaps.

15         THE COURT:   I just received the motion this

16   morning.  I haven't had a chance to read it.  I have got

17   my Law Clerks looking at it and your opposition.   I

18   guess you'll have to go to another witness.

19         MR. KENATY:   We don't have any witnesses to go

20   to.

21         THE COURT:   What about all the ones you had

22   on Friday - Jose Gutierrez, Altaton Montalvo (ph),

23   Edmondo Patodaca (ph) --

24         MR. KENATY:   Your Honor, none of them are

25   here.  We have moved  on in our case to the Spanish

31

1   wiretaps, and I can't help but point out that we

2   wouldn't be in this position of almost having to stop

3   the trial, if Mr. Stolar had filed this motion to

4   suppress as he should have pre-trial. It came in this

5   morning --

6           MR. STOLAR: I have talked about this motion

7   for a long, long time. I stopped working on this case

8   in August when we agreed on a plea.

9           Now that we're back in business, I filed it as

10  quickly as I could. I didn't not expect the Spanish

11  witnesses to come in until after the two-week break.

12          I'm going to ask, that this witness not be put

13  on, because there are some serious, serious legal

14  problems with the Spanish wire --

15          MR. KENATY: Obviously, Your Honor, the

16  Government feels that there are no strong legal

17  problems. Be that as it may, I know Your Honor has to

18  consider his motion. Until Your Honor frankly rules on

19  that -- the Government is ready to proceed. The Spanish

20  wiretaps set up what happened in California --

21          MR. STOLAR: They showed me exhibits this

22  morning - surveillance of Matta and his family and the

23  house he was in residence at in Spain. Why can't we

24  have a witness to talk about that?

25          MR. KENATY: Because we didn't bring in a

32

1   witness to talk about surveillance.

2          MR. STOLAR:    How are you going to get the

3   pictures in?

4          MR. KENATY:    Because the photos - the

5   surveillance photos - are inextricably intertwined with

6   the wiretaps.

7          For example, on the wiretaps, Mr. Matta -- you

8   hear on the wiretaps, Mr. Matta saying, "I'm going to

9   leave for Mexico on Flight..." --

10         THE COURT:  Keep your voice down.

11         MR. KENATY:    Your Honor, frankly, we might be

12  at a point where we should send the jury out.

13         THE COURT:  I guess so.  I don't know how long

14  I'm going to have to look at the motion.  I'm going to

15  have to look at your opposition, and I'm going to have

16  to hear argument.  How long do I excuse the jury?

17         MR. KENATY:    I think it is a question of how

18  long Your Honor --

19         THE COURT:  I haven't had a chance to look at

20  it at all.

21         MR. STOLAR:  I think you should send them out

22  for -- like 30 minutes or so; take a -- skim over the

23  motion, decide whether it is going to take longer than

24  that, and then send them a message that says, "go to

25  lunch."

33

1          I'm sorry it happened this way, but I did not

2    contemplate having the wiretaps come in at this point --

3          MR. CONNOLLY:    Your Honor, I advised Mr.

4    Stolar on Friday that we were going to put on this

5    evidence.

6          MR. STOLAR:    That's why we have the motion.

7    Sometimes Mr. Connolly tells me - jokes about what a

8    witness is coming --

9          MR. CONNOLLY:    We have brought this witness in

10   from Spain, and we're ready to proceed --

11         THE COURT:    I think your idea is a good one.

12   I'll excuse them for 30 minutes and see where we are.

13                  (IN OPEN COURT).

14         THE COURT:    Ladies and gentlemen, the Court at

15   this point, has to read a couple of briefs on testimony

16   that is going to be offered, and I was just given these

17   this morning.    So I'm going to have to take about 30

18   minutes to look at them now.    So why don't we take a 30-

19   minute recess.    Remember the admonition of the Court.

20                  (RECESS).

21    (TRIAL CONTINUES; JURY NOT PRESENT).

22         THE COURT:    I have read the motion and the

23   opposition to it, and I gather you're going to want to

24   argue.

25         MR. STOLAR:    Yes, Your Honor.    The first

34

1   question about lawfulness under the laws of Spain is

2   something that I have an additional exhibit that the

3   Government provided for me yesterday.

4           I have asked Mr. Connolly for a copy of the

5   application for the wiretap, warrant, and the order.

6   And he said he had a copy of the order for the wiretap

7   for me, and provided me with what is -- purported to be

8   that, as well as a translation for it. Because I want

9   to discuss that for a moment, I would like to hand up to

10  hand it up to the Court.

11          THE COURT: Let me ask now, how much time do

12  you think it is going to take to argue?

13          MR. STOLAR: I think we'll argue very close to

14  1:00.

15          THE COURT:  Tell the jury they're excused

16  please.  All right.

17          MR. STOLAR:  In view of what we have from the

18  attorney in Spain, there should be some form of cause

19  for this wiretap having been put together, and there

20  should be an order indicating the tap is allowed to

21  exist under the laws of Spain.

22          In addition, there should be extensions for -

23  three month extensions - because the statute that was

24  cited to us by the lawyer in Spain stated that the tap

25  only goes to three months --

35

1    THE COURT:   How do we know when the tap was

2    ordered?

3    MR. STOLAR:   We presume the tap was ordered --

4    we don't know when the tap was ordered.

5    THE COURT:   How do we know when they started

6    computation of time?

7    MR. STOLAR:   What we have, and what I just

8    handed you purports to be a summary of when the taps

9    were put on and when they were terminated.   This is a

10   summary that was prepared in April of '86 - about a year

11   after the taps were taken off.

12   So it is not the original order that put them

13   on.   It's merely somebody who says only that the record

14   shows that authorization for the interception started on

15   this particular phone on September 14th '83, and

16   terminated June of '84, but we have no extension, and no

17   interim order.   Nor do we have the original order

18   itself.

19   So as far as we know --

20   THE COURT:   Let's stop right there, because

21   that might be fatal.   What proof do you have that this --

22   that there was an extension that would extend beyond

23   three months - the authority to wiretap?

24   MR. CONNOLLY:   Your Honor, we have provided

25   Mr. Stolar with a summary of a letter signed by the

36

1    Judge that issued all of the wiretaps ordered.  That was

2    properly indicated in the letters rogatory.

3         We have two policemen here from Madrid, who

4    will testify that they went to this same Judge, and

5    personally presented him with applications, and received

6    permission from him, to tap the phones in question here

7    for a period of two years; and that the document that

8    Mr. Stolar has was signed by this Judge.  And it is a

9    summary of the orders that were in effect, allowing

10   these taps under Spanish law.

11        THE COURT:  You mean with the extensions?

12        MR. CONNOLLY:    With the extensions and

13   everything else; there were approximately two different

14   locations - four phones at one location, two phones in

15   another location.  The taps were up from September, '83.

16   There were hiatuses between the taps.

17        The summaries and explain exactly when the

18   Court orders went into effect, and when there was no

19   Court order in effect.

20        They will testify, that they received -- made

21   the application to the Court, pursuant to Spanish law,

22   and were given orders.

23        THE COURT:  Do they have copies of the orders?

24        MR. CONNOLLY:  Your Honor, the first time I

25   heard that anyone wanted a copy of any order for

37

1   anything was this morning -- I'm sorry, yesterday.

2       MR. STOLAR:  On that question, Your Honor, one

3   of the pre-trial motions that was filed in this case was

4   a motion for disclosure of electronic surveillance.  It

5   was quite specific, and sought --

6       THE COURT:  What response was there to it?

7       MR. STOLAR:  There was none provided to me by

8   the Government.

9       MR. CONNOLLY:   Your Honor, the Government

10  provided Mr. Stolar with an abundance of material.  We

11  also provided him with letters, on I believe three or

12  four occasions, and told him,  any materials that you

13  want to see, let us know, and we will make it available

14  for your inspection, at a mutually convenient time and

15  place --

16      THE COURT:  But this was directed at electronic

17  surveillance.

18      MR. CONNOLLY:  Yes, Your Honor.  I understand.

19      THE COURT:  It was not directed at any and all

20  things.

21      MR. CONNOLLY:  I gave him everything that we

22  had that we received from the letters rogatory.

23      THE COURT:  But "everything" you had; what

24  does that mean?

25      MR. CONNOLLY:   Mr. Stolar, Your Honor, at

38

1    arraignment in May, 1984, requested this Court, to turn

2    over to him directly -- or to allow him directly, to

3    look at the letters rogatory that the Government had

4    received from Spain.  This was in early May, 1984.

5         Arrangements were made, so that Mr. Stolar was

6    present when the boxes were opened.  And his represen-

7    tative received a copy of the letters rogatory right out

8    of the boxes.  This is back -- I believe it was somewhere

9    around May 11, 1989.  This is --

10        THE COURT:  '89?  Now we have jumped from '84

11   to '89.  I guess I'm not following you.

12        MR. CONNOLLY:  This is when the letters

13   rogatory -- the letters rogatory -- excuse me, 1988 -

14   '88 at arraignment, Your Honor.

15        THE COURT:  Now, is your 1984 date wrong?  You

16   have been talking about 1984 - May of 1984.

17        MR. CONNOLLY:  This is when the wiretaps were

18   in effect in 1983 and 1984 and 1985.  The letters

19   rogatory were applied for and received in 1988.

20        THE COURT:  That is the date of arraignment -

21   '88?

22        MR. CONNOLLY:  Right, and that is the date

23   when we turned over to Mr. Stolar - or a week later -

24   in toto, everything we had from the letters rogatory --

25        MR. STOLAR:  '89 you turned it over to me.

39

1     MR. CONNOLLY:  I'm sorry, May, '89.

2     MR. STOLAR:   The problem is that among the

3     papers that came with the letters rogatory -- they did

4     not send the application for the warrant or the order

5     authorizing the wiretap.

6     THE COURT:  They apparently didn't have it.

7     MR. STOLAR:  Well, Your Honor, I can't believe

8     that it doesn't exist.

9     THE COURT:  Well, you know, it seems to me,

10    too, Mr. Stolar, that you knew about this.  If you didn't

11    get the material that you though you should have, why

12    didn't you follow it up, by asking them for the applica-

13    tion, and determine whether or not they had it.  And if

14    not, you should have pursued it.  It is not something

15    that just happened a week ago.

16    MR. STOLAR:   I understand that, Your Honor.

17    The problem here - and the Government's response to our

18    motion, they say - "In Spain, there is no statutory

19    authority as to how wiretaps are authorized, and what

20    criteria must be observed."

21    Well, the letter that we have from the lawyer

22    in Spain says that there is.  There are things that have

23    to be done, and originally in the motion, I asked for

24    that material.  It wasn't provided - apparently because

25    they don't have it.

40

1    Now, that doesn't help us and the Court to

2 understand whether or not the actual procedures that the

3 statute lays out were complied with in Spain.

4    THE COURT:  Well, I guess that he is going to

5 have to rely on his witness to testify as to the

6 procedures.  Is that what you're representing to me?

7    MR. CONNOLLY:  Yes, Your Honor.  But there is

8 also other criteria that I know Mr. Kenaty wants to

9 mention to the Court before we even get to this issue.

10    THE COURT:  All right.

11    MR. KENATY:   Your Honor, I respectfully

12 suggest, that perhaps it would be appropriate to deal

13 with several threshold issues --

14    THE COURT:  Why don't you get to the lectern?

15    MR. KENATY:   -- which, when disposed of,

16 precludes us, even coming to the question of the alleged

17 illegality of the Spanish wiretaps.

18    As Your Honor is probably aware, the

19 Government's opposition was created, of course, before

20 the Government ever received Mr. Stolar's motion.  I sat

21 down, having heard that that he was going to perhaps

22 file one, and tried to anticipate what he might say in

23 it, and hence, what you have is my anticipation of Mr.

24 Stolar's motion.

25    It is not a specific response of course,

41

because we never saw it until Your Honor saw it this morning, and inasmuch as I would like to claim, that the Government is so efficient that I could read his motion, and 30 minutes later have a positively specific (ph) opposition, I'm afraid that didn't happen.

But we have heard just now from Mr. Stolar, his claims that he wasn't given things five years ago or two years ago, and is now complaining, and did have a reason to complain about it before. I think once again, it points out that we can dispose of this motion on Rule 12 grounds; that the somewhat disjunctive proceedings that we're in right now would not be happening, or would not be quite so chaotic had Mr. Stolar filed this motion pre-trial.

We would not have a situation, where we, for the first time, see a letter from somebody who is apparently a Spanish lawyer - and a translation that we don't know -- I mean, if we knew that this was going to be an issue, if we knew that Mr. Stolar was going to complain about what he thinks Spanish law is, presumably the Government might have brought somebody from the Attorney General's Office in Madrid to testify.

It is kind of hard to do this, when you hear what his objections are on the morning of the trial instead of it having been filed pre-trial in an orderly

42

1   manner.

2       The second threshold question is equally

3   dispositive of the matter. Earlier this year, the

4   Supreme Court in the <u>Verdugo</u> (ph) case, clearly held,

5   that the Fourth Amendment does not apply to overseas

6   searches of aliens.

7       In this case, Mr. Matta is an alien. He is not

8   a citizen of the United States. If Your Honor is

9   familiar with -- and whatever happened in Spain --

10      THE COURT: Yes. Let me just read the part of

11  that <u>Verdugo</u> matter. The caution (ph) under that

12  decision is that the Fourth Amendment protects, "people

13  from unreasonable searches and seizures. 'People"

14  refers to a class of persons who are part of a national

15  community, or who have otherwise developed such

16  connections with this country, to be considered part of

17  that community."

18      So now, we have to determine whether or not

19  Mr. Mata fits within that class, correct?

20      MR. KENATY: Well, Your Honor, on Page 1064 -

21  this is referring to the Supreme Court Reporter -

22  it says, "how aliens receive constitutional protections

23  when they come within the territories of the United

24  States and build up substantial connections with this

25  country," and also going back --

43

1    THE COURT:  That's what I just made reference

2    to.

3    MR.  KENATY:  And to go back to Page -- at

4    least in the Supreme Court Reporter, 1061, which is the

5    page I believe you were reading from; that the purpose

6    of the Fourth Amendment is to protect the people of the

7    United States against arbitrary action by their own

8    Government.

9    It isn't -- the provision was not intended to

10   restrain actions against aliens "outside the United

11   States territories."  And what happened was clearly

12   "outside the United States territores."  And he is an

13   alien.

14   I would think that that in and of itself would

15   be dispositive of the matter --

16   MR. STOLAR:  Your Honor, may I just -- briefly

17   on that, Your Honor.

18   THE COURT:  Yes.

19   MR. STOLAR:  If you look at the Verdugo

20   opinion - that particular statement as underlying

21   rationale for it - I do not believe it is subscribed to

22   by a majority of the Judges signing the case.

23   It can be seen as dicta - in the context of

24   the Verdugo opinion - as a rationale for why it

25   happened.  However, there is one fairly significant

44

1  thing, and the Verdugo, straight Fourth Amendment type

2  analysis comes out, and is allowed (ph) to come out that

3  way.

4          And there is language by the Chief Justice,

5  where he says that in the absence of Congress having

6  spoken - that Congress has not expressed any opinion -

7  about how searches are to be conducted, it is all

8  Fourth Amendment law.

9          In the wiretap situation, we do have an

10  indication that Congress has spoken, in respect to how

11  United States law enforcement -- that extensive (ph)

12  statutory scheme is designed to protect the integrity of

13  the tap; the listening of the taps, going back to the

14  Court, and everything like that.

15          So we do have Congress speaking. And wiretaps

16  conducted by United States officials, also apply to

17  aliens, whether they are in this country legally or

18  illegally.

19          If the United States goes abroad and initiates

20  a wiretap in a foreign country, one would think --

21          THE COURT: Are you --

22          MR. STOLAR: -- Title 3.5    would apply to

23  their conduct, because Congress has spoken. If United

24  States official goes abroad --

25          THE COURT: -- you suggesting that the United

45

1   States instigated these wiretaps?

2           MR. STOLAR:  I don't know.  I haven't seen the

3   application.  I know that the United States had some of

4   its officers over there listening, or working with the

5   Spanish police.

6           That much we know, because I have seen other

7   reports that indicate that they were there listening,

8   and I understand that that occurred, but essentially -- I

9   don't know if they were involved.  I have never seen the

10  application.

11          And I would like to take a look at it.  We

12  have the Government's response to our Motion For

13  Disclosure Of Electronic Surveillance, because --

14  specifically, I asked for all applications, affidavits,

15  memoranda submitted in support there of.  And I

16  don't know if they said in their response whether they

17  had any or not.

18          THE COURT:  Mr. Kenaty, do you know what

19  response you made to that?

20          MR. KENATY:  I don't.  Maybe Mr. Connolly can

21  perhaps tell you, but I think there is something

22  that needs to be pointed out, because it is in response

23  to something else Mr. Stolar said.

24          Numerous Courts, including the Ninth Circuit

25  have consistently held that Title 3, the Wiretap Statute

46

1    does not apply overseas --

2          THE COURT:    Unless it is a joint effort on

3    behalf of the United States and the foreign country;

4    then certain rules must be followed.    Now, I'm not

5    suggesting that the wiretap laws of the United States

6    must be applied in a foreign country --

7          MR. KENATY:    But what I think the situation

8    is, Your Honor, is Mr. Stolar cannot complain of a

9    violation of Title 3.    I assume he takes that for

10   granted --

11         MR. STOLAR:    I concede that in my papers --

12         MR. KENATY:    Would you once again refrain from

13   interrupting me?

14         THE COURT:    Come on.    Let's go ahead.

15         MR. KENATY:    So we know Mr. Stolar cannot

16   complain of a violation of Title 3.    So what he is

17   complaining about is a violation of the Fourth

18   Amendment.    And what he is trying to -- Verdugo specifi-

19   cally says, that when it is overseas, when it involves

20   an alien, there is no Fourth Amendment to - even -

21   apply.    The Fourth Amendment is just not applicable in

22   those situations.

23         THE COURT:    Let's go back to my original

24   question.    Does Mr. Matta fit under the declaration (ph)

25   of "people" as described in the Verdugo case?

47

1          MR. KENATY:  No, Your Honor.

2          THE COURT:  He was in the United States

3     until when, 19 --

4          MR. STOLAR:  1971.

5          THE COURT:  -- when he escaped.

6          MR. STOLAR:  When he eloped.

7          THE COURT:  When he escaped from or left

8     the jurisdiction of Miami.

9          MR. STOLAR:  Egland Air Force Base.

10         THE COURT:  So as far as we know, at this

11    point in time, he didn't set foot in the United States

12    until he was removed from Honduras and brought back.

13         MR. KENATY:  In 19 --

14         THE COURT:  That was in 1988.

15         MR. STOLAR:  1988.

16         THE COURT:  So these wiretaps took place

17    in 1983, '84, and '85.  So at that time, he was an

18    escapee from a federal institution of some kind.

19         MR. STOLAR:  There was also an outstanding

20    warrant during this period from the Court in Pensacola.

21         THE COURT:  Do you -- maybe I should address

22    this to you, Mr. Stolar.  Are you maintaining that

23    Mr. Matta is qualified under the general term "people"

24    as defined in the Verdugo case?

25         MR. STOLAR:  I would have to say yes.

48

1  I would also have to say quite honestly I do not parti-

2  cularly care for that analysis of what "we the people"

3  means, as a hook for what the Fourth Amendment applies

4  to, as opposed to what the Fifth Amendment applies to.

5      If -- the Fifth Amendment says that no person

6  shall be forced to incriminate himself.  Apparently

7  "person" in that -- it gets into murky areas, but

8  otherwise, I would say that he has sufficient connection

9  to the United States if we accept that analysis, because

10 at the time the wiretaps are on, there is an outstanding

11 warrant.  They want to bring him back to the United

12 States to serve the rest of his time in jail, and

13 perhaps charge him with escape.

14     In addition --

15     THE COURT:  But you see -- go ahead.

16     MR. STOLAR:  Two of his children are citizens

17 of the United States; were born here and hold American

18 passports, and United States agents were interested --

19     THE COURT:  Not only does he have to have a

20 connection, but he has to have a connection with this

21 country, so as to be considered part of the community -

22 a community of this country, and that's where he may

23 have had a connection.  But is the connection -- does it

24 rise to the level, where he is part of the community?

25     That's where I think the problem rests, and I

49

1  don't think that he probably qualifies --

2         MR. STOLAR:  It's a very -- it is a difficult

3  analysis to accept - to try to determine who's got

4  a sufficient connection or not.  If he were in jail in

5  the United States, even though he is an alien, does that

6  make him part of the community?

7         THE COURT:  I doubt it.

8         MR. STOLAR:  Even if he is physically located

9  in the United States?

10         THE COURT:  I guess it would depend on what

11  happened before he was incarcerated; whether he was -- if

12  someone is a very active member in a community for five

13  or ten years and goes into prison and escapes and so

14  forth, that may be one thing.  But I have no idea about

15  those things at this point -- I don't know what his

16  connection was with the United States before 1971.

17         The fact that he was convicted of a crime --

18         MR. STOLAR:  There were substantial connec-

19  tions before that, because there are several arrests

20  that are - both in Miami and New York, when he was a

21  younger person.  And two of his children were born in

22  this country with his first wife; while he was hear

23  prior to 1971.

24         MR. KENATY:  Your Honor, I don't know exactly

25  what Mr. Matta's background in the 60's was.  Perhaps Mr.

50

1   Matta would like to take the witness stand under oath and

2   tell us.

3           I simply don't know.  I do know the reason he

4   was in prison at Egland.  It as for illegal entry into

5   the United States.  That's the charge he was under when

6   he escaped.

7           But it is hard for me to believe, that a man

8   who is "on the run" shall we say, from the United

9   States, having obviously, very voluntarily chosen to

10  stay away form this country for a period of - from 1971

11  to 1983; never entered the United States -- I assume

12  that Mr. Stolar would agree that he never entered the

13  United States from 1971 to 1983, would you?

14          MR. STOLAR:  I would not agree.

15          MR. KENATY:  Well, Mr. Stolar wouldn't agree;

16  maybe put Mr. Matta on the witness stand, if Mr. Matta

17  wishes to say that he was in the United States then; but

18  for the moment, there is no indication at all that he

19  entered the United States from 1971 to 1983.

20          He was living in Honduras - and wherever else

21  - and Spain.  And I cannot believe that an alien who is

22  not a citizen, never attempted to become a citizen, who

23  is in flight from this country -- how he can be remotely

24  considered to be a part of the national community of the

25  United States.

51

1      And I think that it would be equally specious

2  to argue, that having been apprehended by American

3  authorities, he then becomes part of the community, and

4  of course, Verdugo specifically rejected that argument.

5  So, as a result, Your Honor, I think it is frankly very

6  clear that the Fourth Amendment doesn't apply in this

7  case.

8      MR. STOLAR:  Your Honor, assuming for purposes

9  of argument, that the Spanish wiretap is completely

10  illegal under Spanish law, Verdugo then really does not

11  come into the analysis at this point - if it is completely

12  illegal under Spanish law, as it suggests here; that

13  Verdugo would permit that evidence to come into a Court

14  of Law in the United States.

15      The Government cited to you, a case, which I

16  think essentially talks about some of the correct law,

17  and that is the La Chappel (ph) case, where the circum-

18  stances of a search in that case are such, that they

19  shocked the judicial conscience.

20      If this wiretap were totally illegal under the

21  law of Spain, I suggest that the judicial conscience

22  would be shocked by the Government introducing evidence

23  -totally illegal in a foreign country - in a Court in

24  this country.

25      I'm going to argue, that if we get to the

52

1   point that -- that -- we don't have the tapes.  There is

2   a  serious  question  about  the  integrity  of  the  so-

3   called  "summaries,"  because  we  don't  have  the  tapes

4   themselves.

5            THE  COURT:   I  realize  that,  but  they  have

6   cited  some  law  here,  that  indicates  that  such  summaries

7   were  found  to  be  properly  admitted.

8            MR.  STOLAR:   I  would  like  to  check  that  case

9   on  Page  Nine.   Yes.   I  saw  that.   I  would  like  to  read

10  that  case.   I  have  never  read  that  case.

11           THE  COURT:   All  right  then;  we'll  check  that

12  out.   Then,  there  is  the  case  --  cases  on  Page  10,  that

13  talk  about  admitting  sumamaries.

14           MR.  STOLAR:   As  past  recollection  recorded

15  of  --

16           THE  COURT:  Yes,  apparently  so.   But  I  suppose

17  that  because  of  the  interruption  we're  going  to  have  in

18  the  trial,  if  you  --  now  have  ample  time  I  think  to

19  challenge  the  authority  of  the  wiretap,  and  you  find

20  that  it  wasn't  done  under  property  authority,  then  we'll

21  have  to  strike  the  evidence.

22           But  you  certainly  have  enough  time  now  to  run

23  it  down.   And  the  Government  says  that  they  don't  have

24  the  applications.

25           Now,  maybe  you  say  that  they  must  exist.   If

53

1   they exist, I suppose you can find them, and determine

2   -- or offer evidence to the Court that they're illegal;

3   they weren't undertaken and consummated under proper

4   Spanish law.

5        I guess the Court would be faced with the

6   question, of whether or not the evidence should be

7   stricken.

8        MR. STOLAR:   I understand that, Your Honor,

9   but even as a preliminary matter, I think that we should

10  take some testimony - if you're inclined to - out of the

11  presence of the jury, as to the involvement of the

12  United States in the initiation and conducting of the

13  wiretaps.

14       MR. KENATY:   Your Honor, it is irrelevant.   In

15  -- the search of Mr. Verdugo's residences were initiated

16  by the DEA and conducted by the DEA, in cooperation with

17  the Mexican federal police.

18       That didn't matter.   There is no issue there -

19  of the extent of American involvement --

20       THE COURT:   Do you agree, though, that if the

21  wiretaps were not done under the laws of the country in

22  which they were performing the wiretap, that that makes

23  it illegal?

24       MR. KENATY:   Oh, no, Your Honor.

25       THE COURT:   You think -- so that I understand

54

1   your position, you're saying that, notwithstanding the

2   fact that the wiretap was performed by foreign authori-

3   ties without proper authority in their country, that

4   those are still admissible?  Is that your position?

5       MR. KENATY:   Oh, yes, Your Honor.   Let's

6   assume, arguendo, that they were illegal under Spanish

7   law.  They weren't --

8       THE COURT:  Let's assume that -- let's assume

9   that there was a three-month period when they could

10  wiretap, and an extension had to be requested, and it

11  was never requested, but wiretaps were still taken.  Now,

12  let's assume that hypothetically to be the case.  You're

13  saying, that the wiretaps that were taken after the

14  authority ran out are still proper evidence in this

15  case?

16      MR. KENATY:   In this Court?  Yes.  And I think

17  that there is a very clear answer; that, assume as Your

18  Honor has for the sake of argument, that Spanish law was

19  violated.

20      The defendant then has to come into the United

21  States and say that they should be suppressed under some

22  United States rule or some United States law.

23      Now, prior to Verdugo, normally, what one

24  might say is -- would be that the Fourth Amendment has

25  been violated, since the search was conducted overseas

55

1  in violation of Mexican law or Spanish law or whatever.

2          What  Verdugo  tells  us  is  that  in  those

3  circumstances - and I'm quoting - "the Fourth Amendment

4  has no application."

5          In other words, the defendant needs a basis in

6  American law to complain about what happened overseas.

7  And there is no basis in American law.  Title 3 doesn't

8  apply.    The  Fourth  Amendment  doesn't  apply.    What

9  foreign -- what happens on foreign soil with respect to

10 foreign citizens who are aliens of this country, the

11 Fourth Amendment simply does not apply to.

12         That's the holding of the Supreme Court this

13 year.   And of course, that is after La Chappel and most

14 of the other cases on this point.

15         The -- in fact, it is the most recent position

16 I believe in any Court on this point.   And obviously,

17 the Supreme Court's opinion is controlling.

18         So even if the Spanish wiretaps were illegal

19 under Spanish law, even if they were instigated by the

20 DEA - again they weren't - but even if they were, it

21 wouldn't matter, because Verdugo  says, "foreign soil,

22 foreign citizens; Fourth Amendment does not apply."   I

23 think that Chief Justice Rhenquist's opinion on that

24 point is very clear.

25         THE COURT:  Do you think that the Verdugo case

56

1  has in mind, that you could violate the laws of another

2  country, and use the fruits of that violation in trials

3  in the United States?  Do you think that's what they had

4  in mind when they wrote that opinion?

5      MR. KENATY:   I don't know what they had in

6  mind, Your Honor.   And I don't think that anyone is

7  condoning the violations of Spanish law, but remember

8  what the Supreme Court and numerous other Courts have

9  held, is that the Exclusionary Rule is a Rule to try to

10  bring - I'm making up the words now - some sense of law

11  and order.

12      It's probably not a good phrase, but it

13  probably tells Your Honor what I'm thinking about here -

14  in the United States, but that's not what it tries to do

15  overseas.

16      If Spanish law were violated, there presumably

17  is a remedy in Spanish law.   I'm not familiar with

18  Spanish law, to exactly know what that remedy is -

19  whether some sort of criminal provision or civil

20  provision; perhaps a civil lawsuit, but it is not the

21  United States.

22      The DEA Agents who, for example searched René

23  Verdugo's residences in Mexico, they acted, I imagine,

24  with a certain degree of impunity.   The Fourth Amendment

25  doesn't apply.   I think that Chief Justice Rhenquist

57

says that loudly and clearly.

MR. STOLAR:    In the absence - he says it - of Congress having spoken on the question.    And here, Congress has spoken about the conduct of United States law enforcement officials.

I agree, that Title 3 does not apply overseas to a foreign wiretap, but if a DEA Agent went overseas, and initiated a wiretap in violation of American law and Spanish law, I think that the Government's extreme position here would be that you can still receive the evidence - and that's going a little too extreme.

THE COURT:    We don't know what the facts are with respect to that.

MR. STOLAR:    Yes.    It's interesting that - coming to one of the final arguments I make about the request for judicial assistance, is so-called "letters rogatory" were made.

This is one point, where if I had been given notice that this application was made, then I would have argued to Judge Kenyon, who was the one who signed this request; that included in here has to be a request for the document that initiated the tap.

That was not included in the request for judicial assistance.    All they wanted were the records of the electronic surveillance conducted - not the

58

1    underlying basis for it.    And I would have said -

2    if we had been on notice - "let's have the whole

3    package."

4         MR. KENATY:    Your Honor, can I have 60

5    seconds?

6         THE COURT:    Yes.

7         MR. KENATY:    I think that Mr. Stolar may have

8    misstated the law.    I think he suggested that Title 3

9    does not apply to foreign wiretaps, but it applies to

10    DEA wiretaps overseas.

11         Title 3 has no application outside of the

12    United States, no matter who uses the wiretap.    There

13    are several cases cited in my brief.    And I also refer

14    the Court to a Ninth Circuit, <u>United States vs. Peterson</u>;

15    812 F2d 492.    That is the page on which it is found,

16    which says, "Title 3 has no extra-territorial force;"

17    end of discussion.

18         THE COURT:    All right.    You check out your

19    cases, and come back at 1:30, and we'll take it up

20    again.

21         MR. STOLAR:    I read <u>Peterson</u> yesterday by the

22    way, and <u>Peterson</u> is a search for physical evidence,

23    based on an illegal Philippine wiretap.    The wiretap

24    evidence itself was not sought to be admitted.

25         THE COURT:    We'll resume at 1:30.

59

1          (RECESS).

2          (TRIAL CONTINUES).

3          THE COURT:   Good afternoon.   Mr. Stolar, you

4    checked  out  some  of  the  cases  that  you  hadn't  had  a

5    chance to read?

6          MR.  STOLAR:   Yes,  I  did,  Your  Honor.   The

7    Maxwell  case  case  is  somewhat  incorrectly  reported  to

8    the  Court.   Maxwell  was  not  a  wiretap  or  a  series  of

9    wiretaps.

10         Maxwell  was  a  single  recording  of  a  conver-

11   sation,  made  off  of  a  bug,  where  a  summary  of  what  was

12   on  the  bug  was  prepared,  and  the  original  mini-phone

13   wire  was  lost  in  between  the  first  trial  and  the  second

14   trial - or  it  was  erased  or  reused.   And  so  as  to  that

15   portion  of  the  tape - that  single  conversation - that

16   was  lost.   The  original  was  lost.

17         The  witness  was  permitted  to  testify  about  the

18   summary  that  he  prepared.   So  the  case  was  not  exactly  a

19   wiretap  case.   And  I  have  found  no  cases,  where  a  whole

20   series  of  wiretaps  have  been  permitted  to  be  used  or

21   testified  to  in  this  fashion.

22         The  other  cases  that  are  cited  were  about  past

23   recollection  recorded,  or  accurate  statements  of  the  law

24   --   but  once  again,  one  of  them  deals  with  a  chemist's

25   report,  one  of  them  deals  with  a  telephone  conversation -

60

1   a single conversation, etc.

2        None of them deals with two years' worth of

3   wiretaps, where we don't have the tape recordings.

4   Another -- I found another case called United States vs.

5   Duffy.   That is a case that came out of what was then

6   the Fifth Circuit, and it is a past recollection

7   recorded case, dealing with the agent's recorded

8   recollection of a laundry mark that was on a shirt that

9   was found on the truck when the shirt was not available.

10       In the course of the discussion in that case,

11  the Court said, "...Because the writing involved in this

12  case was simple, the inscription 'Duf,' there was little

13  danger that the witness would inaccurately remember the

14  terms (ph) of the writing."

15       So the danger of whether the memory of the

16  witness is accurate -- and also the Court said that the

17  terms of the writing were by no means central or

18  critical to the case against Duffy.

19       That puts us in a very different position.

20  These transcripts or summaries are conversations and are

21  central or critical to the Government's case - at least

22  I believe they are.  At least, that's what my research

23  came up with.

24       And the further reason why I would suggest

25  that they are inadmissible, the transcripts themselves

61

1    are not all transcripts. They are summaries. I wind up

2    having to make a due process argument, and a confronta-

3    tion argument, where summaries of a conversation that my

4    client or other alleged co-conspirators might have been

5    involved in, which were deemed at the time not to be

6    pertinent to what the Spanish police were interested in,

7    might be very pertinent to me.

8         If we had the tapes, I would have been able to

9    pull stuff out.    And I have had experience in dealing

10   with cases of wiretaps, where listening to every single

11   tape, I have found one piece of evidence that wound up

12   being the exculpatory piece of evidence that the jury

13   wanted read back in deliberation, and found my client

14   not guilty based on that little bit of conversation I

15   found.

16         So it is accuracy - the ability to remember ;

17   the fact that wires are central to the cases; and there

18   are no cases, where we have two years' worth of wiretap.

19         I was correct in advising the Court that the

20   "we the people" part of the Verdugo opinion is not a

21   majority.    There are two concurrences, and there are

22   three dissents; they clearly don't go for the -- there

23   are concurrences by Justice Kennedy and Justice Stevens.

24         Justice Stevens says, "I cannot place any

25   weight on references to 'the people' in the Fourth

62

1    Amendment as the source of restricting its protections."

2    That was Kennedy, excuse me.  So he opts out of that

3    language in the majority opinion, although he concurs in

4    the result.  the same is true for Justice Stevens.

5        THE COURT:  All right.  Do you agree that the

6    bottom line may be - notwithstanding your argument -

7    that this evidence should be received, and the jury

8    given an admonishment over objection; that it is

9    received, and that -- because the Court has found it

10   goes to weight, as opposed to admissiblity?  Do you

11   believe that such an admonishment should be given, in

12   the event the Court allows this in?

13       MR. STOLAR:  If the Court allows it in, I'll

14   take any instruction I get, and I, of course -- if the

15   evidence were in the case, I'll be arguing about exactly

16   that as well --

17       THE COURT:  I'm concerned with the time

18   element, of course.

19       MR. STOLAR:  I understand, Your Honor.

20       THE COURT:  That's a very large factor to be

21   considered here.  Mr. Kenaty, do you want -- anything

22   you want to say in response to what has been said here?

23       MR. KENATY:  Very, very briefly.  Only with

24   respect to -- I'll move to the podium.

25       THE COURT:  Yes.  Will you please?

63

1        MR. KENATY:  Very briefly with respect to Mr.

2   Stolar's comments concerning Sections Four and Five of

3   the Government's opposition; Mr. Stolar had told the

4   Court that he hadn't found any cases that allow what he

5   -- the use of what he calls sweeping transcripts of

6   summaries, and I think -- the Duffy case that he

7   mentions is totally irrelevant.

8        And I would simply call Your Honor's attention

9   to the Gerhardt case, and to the Taylor case.  And I

10  think that Your Honor has picked up on those - when Your

11  Honor said that the unavailablity of the recordings goes

12  to the weight, and not to admissability of the evidence.

13       THE COURT:  How do you respond to Mr. Stolar's

14  argument, that there might have been exculpatory evidence

15  in those conversations?  But he has no way of producing

16  that, because there is no transcripts.  It is only a

17  summary, and one could gather that the agent is

18  sumamrizing those things which are favorable to the

19  prosecution vis-a-vis favoring the defendant - or excul-

20  patory in nature.

21       MR. KENATY:  Again, to go back to Gerhardt,

22  the Court held that, once the evidence was destroyed

23  fraudulently, the party seeking to introduce -- I think

24  that Mr. Stolar's point might be well taken, if he could

25  some how establish - and I don't see how he could -

64

1  that the tapes were deliberately destroyed in some sort

2  of fraudulent fashion.

3          They were not in this case, and we have what

4  is left of the Spanish officer's summaries, which are

5  believed to be the pertinent conversation.  There is no

6  indication at all, that there was anything in there that

7  was exculpatory, and there is no indication that even a

8  word could some how be construed to be exculpatory; that

9  the  Spanish  officers  malevolently,  in  bad  faith,

10  destroyed  it.    And  that  is  the  course  of  conduct

11  that  occurs  from  time  to  time  within  the  American

12  context as well --

13          THE  COURT:   Let  me  ask  this  question.   Are

14  some of these tapes transcribed?

15          MR. KENATY:   I believe -- I'm looking at Mr.

16  Connolly for confirmation of this.  The Spanish police

17  officers took notes of many of the conversations.  These

18  are  summaries.   Several  of  the  more  important  ones -

19  am  I  correct - they  are  transcribed  almost  word  for

20  word.

21          MR. CONNOLLY:  Portions.

22          THE  COURT:   So  that  I  understand,  there  are

23  transcripts of portions of the tapes, and the rest of it

24  is summarized.

25          MR. KENATY:   I believe that is correct.  Mr.

65

1    Connolly?

2          MR. CONNOLLY:  Your Honor, there are parts to

3    the tapes or summaries, where the officers put down

4    verbatim the statements that were made.  There are no

5    transcriptions like we normally see, "Question, Answer,

6    Question, Answer, Speaker."  They are generally

7    summaries and specifics put in with the summaries.

8          In addition to that, there are three tapes

9    that were obtained from the Spanish police that the

10   defense have been supplied with, that they don't intend

11   to use.

12         THE COURT:  They are verbatim - true and

13   accurate copies?

14         MR. CONNOLLY:  They are not transcripts.

15         MR. STOLAR:  Your Honor, if you would like

16   -- well, two things.  One of those three -- there are

17   three tapes apparently that survived.  How tapes early

18   in the wiretap could survive - the tapes from 1983, when

19   they're supposedly reused, is something we ought to

20   explore, but I believe that one of those tapes exists

21   of the conversation; but the notes prepared by these

22   Spanish police were only a summary.

23         And we're in the process of trying to get that

24   transcribed and translated, so we can see - possibly

25   have some clue - as to the type of things they left out,

66

1   but so you're not in the dark, I would hand up to the

2   Court -- copies from the 17th of September -- which I

3   pulled at random.  You can see some of them are summar-

4   ies, and then there is something about, "Jose calls

5   Arturo," etc.  Would you take a look at them?

6                    (HANDED TO THE COURT).

7            THE    COURT:    Are these documents that the

8   Government has given you copies of?

9            MR. STOLAR:  Yes, they are translations -- and

10  there's one that Mr. Burn just pointed out to me; at the

11  end of the conversation, the person identified as "N",

12  likely to be Nancy Vasquez, gets on the phone and says -

13  "asks that the photos that Don Jose requested not be

14  sent; speaks of other things, not important;" important

15  to whom?

16           THE COURT:  Anything further?

17           MR. KENATY:  Yes, Your Honor.  I think as I

18  previously said, the fact that much -- may of the

19  originals are no longer in existence goes to the weight,

20  not to admissibility under the Best Evdence Rule.  And

21  of course, Mr. Stolar will have an ample opportunity to

22  cross-examine those witnesses.

23           MR. STOLAR:  Your Honor, would you think, that

24  a hearing outside the presence of the jury might be in

25  order with respect to the method by which the tapes were

67

1  obtained, and the reason why the tapes were lost or

2  erased?  Because I'm still dumbfounded  by the fact that

3  these -- are used on a regular basis.  Why do we have --

4  it goes to the question, under Rule 1004, Subdivision

5  One, about whether they were lost or destroyed in bad

6  faith.

7          THE COURT:  Do you have anything to say in

8  response to that?

9          MR. KENATY:  No, Your Honor.

10          THE COURT:  Well, I presume certain foundation-

11  al questions will have to be asked of these witnesses

12  before they're permitted to give testimony.

13          So I guess Mr. Stolar's point is - should this

14  be taken out of the presence of the jury - and I don't

15  want to spend a lot of time with it.

16          MR. KENATY:  I'm not aware of Mr. Stolar

17  generally being brief on such matters.  If we're going

18  to do it, we're going to have to do it --

19      ·    THE COURT:  I've got to be concerned about the

20  jurors sitting in the jury room; not that I'm not

21  willing to do it, but what do you anticipate, Mr.

22  Stolar?  What do you envision by way of the time

23  necessary to probe into these matters?

24          MR. STOLAR:  I guess it would depend upon

25  how much --