NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
AMY E. POMERANTZ (Cal. Bar No. 275691)
Assistant United States Attorney
Violent and Organized Crime Section
      1300 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-0730
      Facsimile: (213) 894-3713
      E-mail:    amy.pomerantz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Nos. CR 85-606-JAK; 88-129-JAK |
| | |
| Plaintiff, | UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) |
| v. | |
| JUAN RAMON MATTA-LOPEZ, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Amy E. Pomerantz, hereby files this response to defendant Juan Matta-Lopez's (also known as Juan Ramon Matta-Ballesteros's) motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  The government asks this Court to dismiss the motion, which relies on a statute that does not apply to defendant's convictions.  Even if the Court reaches the merits, however, the motion must be denied.

1    This opposition is based upon the attached memorandum of points

2 and authorities, the files and records in this case, and such further

3 evidence and argument as the Court may permit.

4 Dated: April 26, 2020          Respectfully submitted,

5                                NICOLA T. HANNA
                                 United States Attorney
6
                                 BRANDON D. FOX
7                                Assistant United States Attorney
                                 Chief, Criminal Division
8

9                                _____/s/_____
                                 AMY E. POMERANTZ
10                               Assistant United States Attorney

11                               Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

I.    INTRODUCTION...................................................................1

II.   STATEMENT OF FACTS.............................................................2

      A.    Defendant's Crimes and Sentence.........................................2

      B.    Incarceration and Projected Release Date................................4

      C.    Defendant's Current Motion for Compassionate Release
            and Failure to Exhaust Administrative Remedies..........................4

      D.    The Bureau of Prisons' and Congress's Response to
            COVID-19................................................................4

III.  ARGUMENT......................................................................8

      A.    Because 18 U.S.C. § 3582(c) Does Not Apply to
            Defendant, He May Not Petition the Court Directly for
            Release................................................................10

      B.    Defendant is Likewise Ineligible For Relief Under 18
            U.S.C. § 3582(c)(1), Even If It Were to Apply..........................12

            1.    Legal framework for compassionate release under
                  18 U.S.C. § 3582(c)............................................12

            2.    Defendant Has Failed to Exhaust Administrative
                  Remedies, Thus Depriving this Court of Authority
                  to Consider His Claims........................................15

                  a.    Defendant did not wait the required 30 days
                        before raising this motion with the Court.............16

                  b.    Failure to exhaust cannot be excused..................16

            3.    Defendant Has Failed to Demonstrate an
                  "Extraordinary and Compelling" Reason to Allow
                  Release in His Case...........................................19

                  a.    Defendant is not eligible for compassionate
                        release...............................................20

                  b.    Defendant remains a danger to the community,
                        likewise defeating his eligibility....................25

            4.    Even If Defendant Were Otherwise Eligible, 18
                  U.S.C. § 3553(a) Factors Do Not Support a Shorter
                  Sentence......................................................28

IV.   CONCLUSION...................................................................29

i

1

**TABLE OF AUTHORITIES**

2

DESCRIPTION                                                    PAGE(S)

3

**CASES**

4

<u>Bowles v. Russell</u>,
        551 U.S. 205 (2007)........................................16

5

<u>Fort Bend County v. Davis</u>,
        139 S. Ct. 1843 (2019)....................................17

6

<u>Landgraf v. USI Film Prods.</u>,
        511 U.S. 244 (1994).......................................16

7

8

<u>Meyers v. Bethlehem Shipping Corp.</u>,
        303 U.S. 41 (1938)........................................17

9

<u>Ross v. Blake</u>,
        136 S. Ct. 1850 (2016)....................................17

10

11

<u>Shaw v. Bank of America Corp.</u>,
        946 F.3d 533 (9th Cir. 2019)....................13, 15, 16

12

<u>United States v. Applewhite</u>,
        No. 08-CR-60037,
        2020 WL 137452 (D. Or. Jan. 13, 2020)................25, 27

13

14

<u>United States v. Ayon-Nunez</u>,
        No. 16-CR-130-DAD,
        2020 WL 704785 (E.D. Cal. Feb. 12, 2020)..................22

15

16

<u>United States v. Butler</u>,
        970 F.2d 1017 (2d Cir. 1992)..............................14

17

18

<u>United States v. Chambliss</u>,
        948 F.3d 691 (5th Cir. 2020)..............................14

19

<u>United States v. Davis</u>,
        No. 19-1604,
        ECF No. 50 (3d Cir. Mar. 20, 2020)........................24

20

21

<u>United States v. Ebbers</u>,
        --- F. Supp. 3d. ---,
        2020 WL 91399 (S.D.N.Y. Jan. 8, 2020)..............15, 18, 19

22

23

<u>United States v. Eberhart</u>,
        No. 13-CR-313-PJH-1,
        2020 WL 1450745 (N.D. Cal. Mar. 25, 2020)........16, 17, 18, 20

24

25

<u>United States v. Gileno</u>,
        No. 19-CR-161-VAB-1,
        2020 WL 1307108 (D. Conn. Mar. 19, 2020)..............18, 22

26

27

28

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                    PAGE

<u>United States v. Gotti</u>,
    No. 02-CR-743,
    2020 WL 497987 (S.D.N.Y. 2020)................................25

<u>United States v. Greenhut</u>,
    No. 18-CR-48-CAS,
    2020 WL 509385 (C.D. Cal. Jan. 31, 2020).....................14

<u>United States v. Hamilton</u>,
    715 F.3d 328 (11th Cir. 2013)................................14

<u>United States v. Hir</u>,
    517 F.3d 1081 (9th Cir. 2008)................................26

<u>United States v. Mangarella</u>,
    No. 06-CR-151,
    2020 WL 1291835 (W.D.N.C. Mar. 16, 2020).....................14

<u>United States v. Mayer</u>,
    235 U.S. 55 (1914)...........................................17

<u>United States v. McGraw</u>,
    No. 2:02-CR-00018-LJM,
    2019 WL 2059488 (S.D. Ind. May 9, 2019)......................28

<u>United States v. Neman</u>,
    No. 14-521-JAK,
    ECF No. 863 (C.D. Cal. Mar. 30, 2020)....................18, 19

<u>United States v. Reynolds</u>,
    956 F.2d 192 (9th Cir. 1992).................................26

<u>United States v. Rodriguez</u>,
    CR 11-148-JVS,
    ECF No. 2021 (C.D. Cal. Mar. 21, 2020)........................1

<u>United States v. Shah</u>,
    No. 10-70-CJC,
    ECF No. 329 (C.D. Cal. Mar. 30, 2020)....................17, 22

<u>United States v. Sloane</u>,
    No. 19-CR-10117-IT-11,
    ECF No. 647 (D. Mass. Mar. 19, 2020).........................18

<u>United States v. Spears</u>,
    No. 98-CR-208-SI-22,
    2019 WL 5190877 (Oct. 15, 2019)..............................27

<u>United States v. Urso</u>,
    No. 03-CR-1382,
    2019 WL 5423431 (E.D.N.Y. Oct. 23, 2019).....................25

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

United States v. Wages,
        271 F. App'x 726 (10th Cir. 2008).............................15

United States v. Weidenhamer,
        No. CR16-01072-001-PHX-ROS,
        2019 WL 6050264 (D. Az. Nov. 8, 2019).........................13

United States v. Willingham,
        No. CR113-010,
        2019 WL 6733028 (S.D. Ga. Dec. 10, 2019).....................20

United States v. Willis,
        382 F. Supp. 3d 1185 (D.N.M. 2019)............................15

**STATUTES**

18 U.S.C. § 3142(g)................................................26, 28

18 U.S.C. § 3582(c)...................................................passim

18 U.S.C. § 3621(b).....................................................8

18 U.S.C. § 3622.....................................................8, 9

18 U.S.C. § 3624........................................................8

18 U.S.C. § 4205(g)...................................................passim

28 U.S.C. § 994(t)...............................................10, 11, 28

**OTHER AUTHORITIES**

Attorney General, Memorandum for Director of Bureau of Prisons
        Re: Prioritization of Home Confinement as Appropriate in
        Response to COVID-19 Pandemic (March 26, 2020),
        available at https://www.justice.gov/file/1262731/download.....7

California Executive Order N-33-20 (March 19, 2020),
        available at https://covid19.ca.gov/img/Executive-Order-N-
        33-20.pdf....................................................21

Coronavirus Aid, Relief, and Economic Security Act ("CARES
        Act"),
        Pub. L. No. 116-136,
        134 Stat. 281 (March 27, 2020)................................6

Federal Bureau of Prisons Health Services Division, Pandemic
        Influenza Plan---Module 1: Surveillance and Infection
        Control (Oct. 2012),
        available at
        https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf........3

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

Federal Bureau of Prisons Health Services Division, Pandemic
    Influenza Plan---Module 3: Health Care Delivery (Oct.
    2012),
    available at
    https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf........4

Federal Bureau of Prisons Program Statement No. 5050.50,
    Compassionate Release/Reduction in Sentence: Procedures for
    Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January
    17, 2019),
    available at
    https://www.bop.gov/policy/progstat/5050_050_EN.pdf........7, 17

Federal Bureau of Prisons Program Statement No. 5280.09, Inmate
    Furloughs (January 20, 2011),
    available at
    https://www.bop.gov/policy/progstat/5280_009.pdf...............7

Federal Bureau of Prisons Program Statement No. 6190.04,
    Infectious Disease Management (Jun. 3, 2014),
    available at
    https://www.bop.gov/policy/progstat/6190_004.pdf...............4

Federal Bureau of Prisons, Action Plan Phase V (Mar. 31, 2020),
    available at
    https://www.bop.gov/resources/news/20200331_covid19_action_
    plan_5.jsp..............................................4, 5

Federal Bureau of Prisons, COVID-19 Action Plan: Agency-Wide
    Modified Operations (Mar. 13, 2020),
    available at
    https://www.bop.gov/resources/news/20200313_covid-19.jsp....4, 5

Federal Bureau of Prisons, COVID-19 Coronavirus,
    available at https://www.bop.gov/coronavirus/index.jsp........6

Federal Bureau of Prisons, Statement from BOP Director (Mar. 26,
    2020),
    available at
    https://www.bop.gov/resources/news/20200326_statement_from_
    director.jsp.........................................3, 5, 6

Federal Bureau of Prisons, Update on COVID-19 (Mar. 24, 2020),
    available at
    https://www.bop.gov/resources/news/pdfs/20200324_bop_press_
    release_covid19_update.pdf..................................5

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Federal Bureau of Prisons, Updates to BOP COVID-19 Action Plan:
      Inmate Movement (Mar. 19, 2020),
      available at
      https://www.bop.gov/resources/news/20200319_covid19_update.
      jsp  3

**REGULATIONS**

USSG § 1B1.13..............................................................passim

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Defendant, a former high-ranking cartel leader who is serving two consecutive life sentences, asks this Court to permanently release him from custody so that he may return to Honduras, where he will not be subject to any form of supervision.  It should not do so.  "The COVID-19 pandemic is gripping the nation.  But that is a fate that affects all citizens, . . . not simply those incarcerated."  Order, <u>United States v. Rodriguez</u>, CR 11-148-JVS, ECF No. 2021 (C.D. Cal. Mar. 21, 2020).  Nevertheless, without satisfying 18 U.S.C § 3582(c)(1)(A)'s mandatory exhaustion requirement or eligibility criteria; based on bare speculation about an uncontained COVID-19 outbreak at USP Canaan, where there are currently <u>zero</u> reported COVID-19 case among inmates and staff members; and while ignoring his continuing danger to the community, defendant seeks immediate--<u>and permanent</u>--release from custody.  (ECF No. 248, "Motion.")  Neither statutory authority nor public health demands such a windfall.  Moreover, defendant's logic would endorse the mass release of convicted criminals <u>into</u> a pandemic, without regard for the factors justifying their sentences or for the Bureau of Prisons' (BOP's) individualized risk assessment.

Defendant's compassionate-release motion must be dismissed or denied, for three reasons.  <u>First</u>, because defendant is serving life sentences for offenses committed prior to November 1, 1987, the provisions of 18 U.S.C. § 3582(c)--including its compassionate-release provisions--do not apply to him at all.  Under the applicable statute, 18 U.S.C. § 4205(g), he is not authorized to petition this Court directly for relief; only the Bureau of Prisons (BOP) may do

so.  Second, even if section 3582(c) did apply, defendant has failed to comply with its mandatory exhaustion requirement--requiring dismissal of the motion or, at minimum, a stay until the appropriate time has passed.  And third, even if the Court could reach the motion's merits, defendant is neither eligible for nor entitled to relief.

## II.  STATEMENT OF FACTS

### A.  Defendant's Crimes and Sentence

Defendant, a high-ranking former member of the Guadalajara cartel, trafficked millions of dollars in Colombian cocaine into the United States in the early 1980s.  (Presentence Report ("PSR").)  He dealt regularly with cartel leaders, including drug kingpin Miguel Angel Felix Gallardo.  (Id.)  Defendant's criminal history dates back to the 1960s and includes numerous federal convictions, including convictions for his role in the infamous February 7, 1985 kidnapping, torture, and murder of DEA Special Agent Enrique ("Kiki") Camarena, and his informant, Alfredo Zavala.[1]

---

[1] Matta was tried by jury in the Camarana case, in C.D. Cal. No. CR 87-00422.  In July 1990, the jury convicted him of multiple counts related to the murder: Count 3, aiding, abetting, and otherwise willfully participating in the kidnapping and murder of Special Agent Camarena for the purpose of maintaining and increasing defendant's position within a racketeering enterprise, in violation of 18 U.S.C. §§ 1959, 2(a); Count 5, conspiracy to kidnap and hold Special Agent Camarena for the purpose of interrogating him on account of the performance of his official duties, in violation of 18 U.S.C. §§ 1201(c); and Count 6, aiding, abetting, and otherwise willfully participating in the abduction and holding of Special Agent Camarena while he was engaged in, and on account of, the performance of his official duties, in violation of 18 U.S.C. §§ 1201(a)(5),2(a).  Matta was sentenced to concurrent terms of life imprisonment as to each of those three convictions.

As the Court is aware, it vacated these convictions based on issues relating to forensic hair evidence, granting defendant a new trial under 28 U.S.C. § 2255.  The government decided not to re-try the charges related to SA Camarena and thus they were dismissed.

2

At present, defendant is serving two consecutive life sentences arising from two different cases in this District.  In the first case, CR 85-00606-PAR, defendant was convicted by a jury of all seven counts in the indictment: (1) Conspiracy to Possess with Intent to Distribute Controlled Substances, 21 U.S.C. § 846, 841(a)(1) (Count 1); Distribution of Controlled Substances, 21 U.S.C. § 841(a)(1) (Counts 2-5); Possession with Intent to Distribute Narcotic Controlled Substance, 21 U.S.C. § 841(a)(1) (Count 6); and Continuing Criminal Enterprise, 21 U.S.C. § 848 (Count 7).  (PSR at 5.)  The overt acts charged in the conspiracy counts involved the receipt, transfer, and possession of approximately 470 kilograms of cocaine and in excess of $20 million in cash from cocaine sales. (PSR at 10.) As charged in Count 7, defendant occupied a management position in this narcotics enterprise and gained significant proceeds. (PSR at 11.)  Specifically, ledgers introduced at trial showed the receipt of over $22 million by one of defendant's co-conspirators on defendant's behalf. (PSR at 13.) On January 16, 1990, defendant was sentenced to a non-parole eligible life sentence concurrent to five 15-year sentences running consecutive to one another.  (Williams Decl. ¶ 5, Exh. A.)

In the second case, CR No. 88-129-WJR, defendant was likewise convicted by jury of numerous conspiracy and drug distribution charges, along with a continuing criminal enterprise charge.  (PSR at 27.)  As alleged in the indictment in this case, defendant obtained thousands of pounds of Columbian cocaine and directed planes to transport the narcotics into Southern California, where it was then distributed by local dealers working in defendant's network. (CR 88-129-WJR, Dkt. 1.)  On March 11, 1991, defendant was sentenced to a

life sentence on the continuing criminal enterprise charge, concurrent with ten (10) consecutive 15-year sentences for which he could become parole eligible after serving one-third of the sentence. (Williams Decl. ¶ 6, Exh. A.)  This life sentence runs consecutively with the life sentence imposed in case number CR 85-606-PAR, which defendant is still serving.  (Id.)

**B.    Incarceration and Projected Release Date**

Defendant is currently serving his two consecutive life sentences at USP Canaan, in Pennsylvania. He has no projected release date.

**C.    Defendant's Current Motion for Compassionate Release and Failure to Exhaust Administrative Remedies**

On March 30, 2020, defendant submitted a compassionate-release request to the BOP by electronic mail. (Williams Decl. ¶ 18, Exh. G.) The following day, the Warden of USP Canaan issued a letter denying defendant's request, on the basis that defendant's release would present a danger to the community.  (Id., Exh. H.)  The Warden further reasoned that "a release would minimize the severity of the offenses to which [defendant] was found guilty of."  (Id.)

On April 3, 2020, merely four days after he submitted his request to BOP, defendant filed this motion with the Court.  (Dkt. No. 248.)  At the foundation of defendant's compassionate-release motion are allegations about the potential for an uncontained COVID-19 outbreak at his BOP facility.

**D.    The Bureau of Prisons' and Congress's Response to COVID-19**

BOP has taken aggressive steps to protect inmates' health and to resist the spread of COVID-19.  "[M]aintaining safety and security of BOP institutions is [the BOP's] highest priority."  BOP, Updates to

4

BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), <u>available</u>
<u>at</u> <u>https://www.bop.gov/resources/news/20200319_covid19_update.jsp</u>.
Thus, the BOP Director recently emphasized that the "response [to
COVID-19] is the Bureau's top priority."  BOP, Statement from BOP
Director (Mar. 26, 2020) (Statement from BOP Director), <u>available at</u>
<u>https://www.bop.gov/resources/news/20200326_statement_from_director.j</u>
<u>sp</u>.

The BOP has never underestimated the threat of infectious
disease.  To the contrary, the BOP has had a Pandemic Influenza Plan
in place since 2012.  <u>Id.</u>; BOP, Pandemic Influenza Plan---Module 1:
Surveillance and Infection Control (Oct. 2012), <u>available at</u>
<u>https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf</u>.  That
protocol is astoundingly detailed, establishing a six-phase framework
requiring BOP facilities to begin preparations when there is first a
"suspected human outbreak <u>overseas</u>."  <u>Id.</u> at i (emphasis added).

At extremely early stages, the Pandemic Influenza Protocol
requires BOP facilities to ensure inmates' access to soap, to train
them on hand-hygiene practices, and to ensure adequate infection-
control supplies.  <u>Id.</u> at 9.  For every phase thereafter (from
preliminary preparation, to a response to active pandemic, to
recovery), it includes detailed procedures required of <u>every</u> BOP
facility.  <u>Id.</u> at 9-11.  These include policies for ensuring for
creating "social distance" and for requiring "frequent environmental
cleaning of 'high-touch' surfaces."  <u>Id.</u> at 2-3, 6.  Facilities must
follow protocols on how to identify sick inmates, track their
interactions, and quarantine the exposed.  <u>Id.</u> at 4-5.  They must
also establish contingency plans to ensure that medical care is not
disrupted, even when faced with an influx of sick inmates.  BOP,

Pandemic Influenza Plan---Module 3: Health Care Delivery (October 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf.  (The BOP has similar protocols for a wide range of diseases.  See BOP Program Statement No. 6190.04, Infectious Disease Management (June 3, 2014), available at https://www.bop.gov/policy/progstat/6190_004.pdf.)

The BOP implemented its Pandemic Influenza Protocol in January 2020, modified as a COVID-19 Action Plan.  BOP, Action Plan Phase V (Mar. 31, 2020) ("Action Plan Phase V"), available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp In Phase 1 of that plan, the BOP began developing policies in consultation with the Centers for Disease Control.  See BOP, COVID-19 Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP Action Plan"), available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Since then, the BOP has serially escalated its response.  BOP, Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.  On March 13, the BOP moved to Phase 2 of its Action Plan, taking steps to "mitigate the spread of COVID-19" in prisons, for the protection of both inmates and staff.  See BOP Action Plan, supra.  The BOP suspended social and legal visits, curtailed inmate movement, established enhanced screening procedures for inmates and staff, and curtailed staff travel.  Id.  Consistent with the Pandemic Flu Protocol, facilities adopted "modified operations"---including staggered meal and recreation times---to promote social distancing.  Id.  Just five days later, the BOP escalated to Phase 3--taking additional steps, including ensuring

that "all cleaning, sanitation, and medical supplies" had been inventoried and were adequately stocked.  Id.

Phases 4 and 5 followed in late March; Phase 6 followed in mid-April.  Beginning March 26, the BOP required all newly admitted inmates to be quarantined or isolated for a minimum of 14 days "or until cleared by medical staff."  See Action Plan Phase V, supra.  On April 1, the BOP instituted a nationwide lockdown.  Id.  For at least a two-week period, "inmates in every institution [were] secured in their assigned cells/quarters to decrease the spread of the virus." Id.  The BOP has also "significantly decreas[ed] incoming movement. Id.  Modified operations will continue, for all institutions, until at least May 18, 2020.  Federal Bureau of Prisons, Bureau of Prisons COVID-19 Action Plan: Phase Six (April 14, 2020), available at https://www.bop.gov/resources/news/pdfs/20200414_press_release_action _plan_6.pdf.

Meanwhile, the BOP has continued working with the CDC, confirming that its approach aligns with current CDC guidance for COVID management in correctional facilities.  Federal Bureau of Prisons, Correcting Myths About BOP and COVID-19, at 1, available at https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformat ion_bop_covid19.pdf ("Correcting Myths").  Currently, BOP medical staff are "conducting rounds and checking inmate temperatures at least once a day"--twice a day where inmates are quarantined or in isolation.  Id.  All BOP staff and inmates have been issued cloth masks to wear on a daily basis--with staff required to wear masks, gloves, and potentially gowns when dealing with isolated and quarantined inmates.  Id. at 1, 3.  "Cleaning supplies have been provided to inmates," and the BOP has provided training on CDC best

7

practices regarding disease transmission and prevention (including sanitation).  Id. at 2.  Common areas are sanitized multiple times a day.  Id. at 3.

The gravity and severity of these measures reflect BOP's commitment to fighting COVID-19 and protecting inmates.  And, although the BOP has not been immune from the pandemic, it has "thus far been fortunate in that [its] rate of COVID-19 infection is remarkably low."  Statement from BOP Director, supra.  There have been no inmates diagnosed with COVID-19 in defendant's facility to date.  And, as of today--despite tens of thousands of COVID-19 cases across the country and over 150,000 inmates under BOP's care--799 BOP inmates have been diagnosed with COVID-19.  All are (or were) isolated from fellow inmates and receiving medical treatment; 385 have recovered.  BOP, COVID-19 Coronavirus (updated daily at 12pm Pacific), available at https://www.bop.gov/coronavirus/index.jsp (last visited April 26, 2020).  "Inmates whose conditions cannot be managed within the institution are sent to the local hospital[.]" Correcting Myths, supra, at 2.

Of course, "as warned by the Surgeon General of the United States, [the BOP] expect[s] to have more cases as the virus continues to spread in the general community," but they "will continue to diligently support all persons system-wide while doing everything [they] can to do [their] part in mitigating the spread of the virus." Statement from BOP Director, supra.

**III. ARGUMENT**

Defendant's motion should be summarily rejected because he is ineligible to petition the Court directly for compassionate release.

8

The general rule is that a district court may not modify a term of imprisonment once it has been imposed unless Congress has created exceptions to this rule of finality.  As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." Teague v. Lane, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence.  Rather, it may do so only if authorized by statute.  See, e.g., Dillon v. United States, 560 U.S. 817, 824-25 (2010); United States v. Addonizio, 442 U.S. 178, 189 & n.16 (1979); United States v. Washington, 549 F.3d 905, 917 (3d Cir. 2008); United States v. Smartt, 129 F.3d 539, 540 (10th Cir. 1997).  One such is 18 U.S.C. § 3582(c)--but it does not apply to defendant at all.

Because defendant was convicted before November 1, 1987, he is subject to 18 U.S.C. § 4205(g) rather than 18 U.S.C. § 3582.  Under section 4205(g), only BOP rather than the defendant can move for relief.  BOP has not filed such a motion on defendant's behalf.  And indeed, it cannot: defendant's life sentence without parole renders him an "ineligible offender" under BOP regulations.  28 C.F.R. § 571.64.  On this basis alone, defendant's motion must be dismissed.

But even if 18 U.S.C. § 3582(c) did apply to defendant, it provides no path to relief.  At present, defendant's motion is unexhausted.  And even if this Court could reach the motion's merits, defendant's claims must fail: he is not eligible for compassionate release and, even if he were, the COVID-19 crisis does not justify a permanent reduction of his well-deserved consecutive life sentences.

**A.   Because 18 U.S.C. § 3582(c) Does Not Apply to Defendant, He May Not Petition the Court Directly for Release**

This Court should dismiss defendant's motion for compassionate release because the applicable statute, 18 U.S.C. § 4205(g), does not permit defendant to seek such relief directly from the Court.

Prior to the Sentencing Reform Act of 1984 ("SRA"), 18 U.S.C. § 4205(g) governed when a sentencing court could reduce the sentence of a federally-convicted prisoner. The SRA then repealed section 4205(g) and replaced it with 18 U.S.C. § 3582(c), which became effective on November 1, 1987. Unlike section 4205(g), which required that any motion for relief be brought by the BOP, 28 C.F.R. §§ 571.60, 571.62, section 3582(c), as amended by the First Step Act in 2018, permits a federal inmate to petition the sentencing court directly for compassionate release (after exhaustion of administrative remedies, or after 30 days from the receipt of the inmate's request for compassionate release with the warden of the facility, whichever comes earlier). 18 U.S.C. § 3582(c)(1)(A).

Contrary to what defendant's motion assumes, section 3582(c) simply does not apply to him at all. Amendments to the SRA explicitly provide that section 3582(c) would apply only to offenses occurring <u>after</u> its effective date;[2] offenses committed prior to November 1, 1987 were deemed subject to "preexisting law"--namely, section 4205(g). <u>See</u> <u>United States v. Scarbrough</u>, 1:73-CR-32-HAB, 2019 WL 2482710, at *2 (N.D. Ind., 2019) (citing SRA § 235(a)(1); as

---

[2] The Senate Report on the provision establishing the effective date stated: "[a]s to an offense committed prior to the effective date, the preexisting law will apply as to all substantive matters including the imposable sentence." S. Rep. No. 98-225, 98th Cong., 1st Sess, 189, <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182, 3372.

1  amended Sentencing Reform Amendments Act of 1985 § 2, Pub. L. 99-217,

2  99 Stat. 1728, Dec. 26, 1985; Sentencing Act of 1987 § 2, Pub. L.

3  100-182, 101 Stat. 1266, Dec. 7, 1987).

4       Here, both of the convictions for which defendant is serving

5  life sentences involved offense conduct that occurred before November

6  1, 1987.  First, as to case number CR 85-00606-PAR, the date of

7  offense conduct for the continuing criminal enterprise conviction is

8  listed as June 23, 1981.  (Williams Decl., Exh. A at 4.)  Similarly,

9  the offense underlying the continuing criminal enterprise charge in

10  case number CR 88-129-WJR occurred on July 24, 1984.  (Williams

11  Decl., Exh. A at 5.)  Thus, defendant is serving terms of

12  imprisonment for crimes that were committed before enactment of the

13  SRA; section 4205(g), not section 3582(c), thus governs.  <u>See</u> 28

14  C.F.R. § 572.40.

15       As noted, "[r]elief under section 4205(g) requires a motion by

16  BOP."  <u>Scarbrough</u>, 2019 WL 2482710, at *2 (citing <u>United States v.</u>

17  <u>Booker</u>, 543 U.S. 220, 300 (2005) (noting that under § 4205(g)

18  "[s]entencing judges had the discretion to reduce a minimum term of

19  imprisonment upon the recommendation of the Bureau of Prisons")).

20  Here, not only has BOP not filed a motion in support of defendant's

21  release, the Warden at USP Canaan denied defendant's request for a

22  reduction in sentence on grounds that his release would present a

23  danger to the community.  (Williams Decl., Exh. H.)  Moreover, BOP

24  regulations would preclude it from bringing a compassionate release

25  motion on defendant's behalf: because defendant was sentenced to life

26  without parole in case number CR 85-00606-PAR, he is an "ineligible

27  offender" for purposes of compassionate release.  <u>See</u> 28 C.F.R.

28  § 571.6 ("The Bureau of Prisons cannot initiate such a motion [for

compassionate release] on behalf of federal offenders who committed their offenses prior to November 1, 1987, and received non-parolable sentences.")

The Court therefore can, and must, dismiss defendant's motion on this basis alone. See Scarbrough, 2019 WL 2482710, at *2-3; United States v. Woolum, Case No. 5:84-CR-21-TBR 2020 WL 1963787, at *2 (W.D. Ky., April 23, 2020) (dismissing compassionate release motion for lack of jurisdiction where defendant's sentence was imposed prior to November 1, 1987 and defendant, not BOP, filed the motion); cf. Sims v. Holenchik, No. CV 08-0978-RGK (MLG), 2009 WL 1505175 (C.D. Cal., 2009) (habeas corpus petitioner was ineligible for compassionate release where the petitioner committed his offenses prior to November 1, 1987 and received a non-parolable sentence).

**B.   Defendant is Likewise Ineligible For Relief Under 18 U.S.C. § 3582(c)(1), Even If It Were to Apply**

   1.   Legal framework for compassionate release under 18 U.S.C. § 3582(c)

As noted above, compassionate release is one of the few exceptions to the rule precluding revision of criminal sentences after their imposition, allowing a court to "reduce the term of imprisonment (and . . . impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)[.]" 18 U.S.C. § 3582(c)(1). This relief, however, is both drastic and permanent. It is thus subject to strict statutory conditions.

First, a district court can evaluate a defendant's request for compassionate release only "after the defendant has fully exhausted all administrative rights" before the BOP. Specifically:

12

after the defendant has fully exhausted all administrative
rights to appeal a failure of the Bureau of Prisons to
bring a motion on the defendant's behalf or the lapse of 30
days from the receipt of such a request by the warden of
the defendant's facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory and

jurisdictional.  See generally Shaw v. Bank of America Corp., 946

F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion

requirements deprive the court of jurisdiction"); United States v.

Weidenhamer, No. CR016-01072-001-PHX-ROS, 2019 WL 6050264, at *2

(D. Az. Nov. 8, 2019) (citing cases).

Second, in evaluating compassionate-release requests, courts

must follow both the statute and relevant, binding policy statements.

See id.; 28 U.S.C. § 994(t); USSG § 1B1.13.  Pursuant to those

authorities, to be eligible for compassionate release, a defendant

must demonstrate: (1) the existence of extraordinary and compelling

reasons, within the meaning of the statute; and (2) that he is not a

danger to the community.  18 U.S.C. § 3582(c)(1)(A).  Specifically,

the statute requires that any reduction be "consistent with

applicable policy statements issued by the Sentencing Commission"--in

this case, USSG § 1B1.13.  Id.  As the Supreme Court recognized in

Dillon, 560 U.S. at 827, because § 3582(c) permits a sentencing

reduction only where it is "consistent with applicable policy

statements issued by the Sentencing Commission," such policy

statements are binding on a court determining eligibility.

USSG § 1B1.13 explicitly defines the "extraordinary and

compelling reasons" that make a defendant eligible for compassionate

release.  See 28 U.S.C. § 994(t).  They include, as relevant here,

(1) a "terminal illness"; (2) a serious medical condition that "that

substantially diminishes the ability of the defendant to provide

self-care within the environment of a correctional facility and from
which he or she is not expected to recover"; or (3) a defendant who
is at least 65 years old, is experiencing a serious deterioration in
physical or mental health because of the aging process, and "has
served at least 10 years or 75 percent of his or her term of
imprisonment, whichever is less." USSG § 1B1.13 (other grounds
omitted). USSG § 1B1.13, comment. (n.1(A)-(B)). "[R]ehabilitation
of the defendant is not, by itself, an extraordinary and compelling
reason for purposes of this policy statement." Id., comment. (n.3).

Defendant bears the burden to prove both that he has "exhausted
all administrative rights" and that "extraordinary and compelling
reasons" exist to support his motion. 18 U.S.C. § 3582(c)(1)(A); see
United States v. Greenhut, No. 18-CR-48-CAS, 2020 WL 509385, at *1
(C.D. Cal. Jan. 31, 2020) (defendant bears the burden of establishing
entitlement to sentencing reduction); United States v. Hamilton, 715
F.3d 328, 337 (11th Cir. 2013) ("defendant, as the § 3582(c)(2)
movant, bears the burden of establishing" eligibility); see generally
United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party
with an affirmative goal and presumptive access to proof on a given
issue normally has the burden of proof as to that issue.").

Third, even for defendants who are statutorily eligible,
compassionate release is a "rare" and "extraordinary" remedy, within
district courts' discretion to deny. United States v. Chambliss, 948
F.3d 691, 693-94 (5th Cir. 2020); United States v. Mangarella, No.
06-CR-151, 2020 WL 1291835, at *2-*3 (W.D.N.C. Mar. 16, 2020).
Specifically, "it is a rare case in which health conditions present
an 'exceptional reason'" to allow for release where detention would
otherwise be warranted. See, e.g., United States v. Wages, 271 F.

14

App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases); accord United States v. Willis, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) ("most courts treat compassionate release 'due to medical conditions [a]s ... a rare event.'").  This reluctance to expansively apply compassionate release is grounded in a concern that any less narrow application would yield significant sentencing disparities.  United States v. Ebbers, --- F. Supp. 3d. ---, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020).

        2.   Defendant Has Failed to Exhaust Administrative Remedies, Thus Depriving this Court of Authority to Consider His Claims

At present, this Court lacks authority to act on defendant's compassionate-release motion at this time even if 18 U.S.C. § 3582(c)(1)(A) applied to his crimes. Under section 3582(c)(1)(A), the Court "may not modify a term of imprisonment once it has been imposed except" upon a defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  Because this statutory condition has not been satisfied here, the Court lacks authority to adjudicate defendant's claims.  See Shaw, 946 F.3d at 541.  Moreover, contrary to defendant's assertion, failure to exhaust cannot be excused.  Instead, as the Third Circuit recently held, § 3882(c)(1)(A) "presents a glaring roadblock foreclosing compassionate release at this point.  United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).

a.  Defendant did not wait the required 30 days
before raising this motion with the Court

Defendant submitted his request for compassionate release on March 30, 2020.  (Williams Decl. ¶ 18, Exh. G.)  The following day, on March 31, 2020, the warden issued a letter denying his request for release.  (Id., Exh. H.)  However, 30 days have not elapsed, as required by 18 U.S.C. § 3582(c)(1)(A)(i).  Accordingly, this Court should dismiss his motion as premature or wait until the required 30 days have elapsed.

b.  Failure to exhaust cannot be excused

Contrary to what defendant argues, this Court may not simply "waive" administrative exhaustion requirements because of COVID-19. (Mot. at 11-20.)  "[S]tatutorily-provided exhaustion requirements deprive the court of jurisdiction and, thus, preclude any exercise of discretion by the Court."  Shaw, 946 F.3d at 533 (citation omitted). Given § 3582(c)(1)(A)'s plain language and purpose, the requirements for filing a sentence reduction motion--including the that defendant exhaust administrative remedies or wait 30 days after filing a request with the warden--are jurisdictional.  Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances.  18 U.S.C. § 3582(c).  It thus "speak[s] to the power of the court," Landgraf v. USI Film Prods., 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "adjudicatory authority," Bowles v. Russell, 551 U.S. 205, 212-13 (2007) (quoting Eberhart v. United States, 546 U.S. 12, 16 (2005) (per curiam)).  That conclusion is reinforced by courts' historical powerlessness to modify a

16

sentence once entered.  See Dillon, 560 U.S. at 825. United States v. Mayer, 235 U.S. 55, 67-69 (1914).

Courts sometimes disagree whether time limits or other restrictions are jurisdictional or instead are mandatory claim-processing rules. See, e.g., Fort Bend County v. Davis, 139 S. Ct. 1843, 1848-50 (2019).  Although the government maintains that the 30-day time limit in § 3582(c)(1)(A)is jurisdictional, the point is ultimately academic.  Even if § 3682(c)(1)(A)'s exhaustion requirement is not jurisdictional, it is at least a mandatory claim-processing rule that must be enforced if a party "properly raise[s]" it.  Eberhart, 546 U.S. at 19.  The government raises the rule here, and it thus must be enforced.

COVID-19 does not alter this conclusion.  While judicially created exhaustion requirements may sometimes be excused, a court may not ignore a statutory command.  "[M]andatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion." Ross v. Blake, 136 S. Ct. 1850, 1857 (2016). Thus, exhaustion remains mandatory regardless of a court's view of the merits: "[o]bviously, the rules requiring exhaustion of the administrative remedy cannot be circumvented" simply by "asserting that [an opposing party's argument is] groundless[.]" Meyers v. Bethlehem Shipping Corp., 303 U.S. 41, 51-52 (1938).

Consistent with these rules, numerous courts have rejected similar claims in the context of unexhausted COVID-19-based requests for compassionate release.  "Because defendant failed to exhaust his administrative remedies, his request for compassionate release based on COVID-19 concerns fails." United States v. Shah, No. 10-70-CJC, ECF No. 329, at 3 (C.D. Cal. Mar. 30, 2020).  Absent such exhaustion,

17

the court "does not have authority to grant the requested relief."
United States v. Sloane, No. 19-CR-10117-IT-11, ECF No. 647, at 2 (D.
Mass. Mar. 19, 2020) (noting no request made to the USP Lompoc
Warden); United States v. Gileno, No. 19-CR-161-VAB-1, 2020 WL
1307108, at *3—*4 (D. Conn. Mar. 19, 2020) (denying COVID-19-based
compassionate-release motion for lack of exhaustion); United States
v. Eberhart, No. 13-CR-313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal.
Mar25, 2020) (same); United States v. Neman, No. 14-521-JAK, ECF No.
863, at 4—6 (C.D. Cal. Mar. 30, 2020) (same).

Exhaustion is particularly inexcusable for errors that an
administrative tribunal is competent to address.  Barron v. Ashcroft,
358 F.3d 674, 678 (9th Cir. 2004).  Indeed, "[g]iven BOP's shared
desire for a safe and healthy prison environment . . . strict
compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on
added--and critical--importance." Raia, 954 F.3d, at 597.  Here, the
BOP is not merely competent to address defendant's compassionate-
release claims; it is uniquely qualified to do so.  Until the First
Step Act, the BOP had exclusive authority to adjudicate such claims.
Notably, the First Step Act did not change the factors relevant to
compassionate release, only the procedures by which a defendant can
raise such claims.  Ebbers, 2020 WL 91399, at *4.  The BOP thus has
immense expertise, both in (1) assessing the safety and health of
their inmates and (2) managing the administration of their
facilities.  As noted above, it likewise has other administrative
procedures potentially available for addressing COVID-19-based
concerns--none of which defendant has given them an opportunity to
evaluate.  Exhaustion cannot--but also should not--be excused.
Eberhart, 2020 WL 1450745, at *2 (declining to excuse failure to

18

exhaust COVID-19 compassionate-release motion); <u>Neman</u>, No. 14-521-JAK, ECF No. 863, at 6 (same).

Until 30 days have elapsed since defendant applied for compassionate release with BOP, this Court lacks authority to grant relief.  18 U.S.C. § 3582(c)(1)(1).  The Court should thus dismiss defendant's motion.  At minimum, the Court should stay consideration of the motion until the BOP has completed its administrative review.

3.   <u>Defendant Has Failed to Demonstrate an "Extraordinary and Compelling" Reason to Allow Release in His Case</u>

Even if the Court had authority to consider the merits of defendant's unexhausted claims--which for multiple reasons, it does not--defendant has failed to establish his eligibility for compassionate release.  "The First Step Act did not revise the substantive criteria for compassionate release"--criteria that is set forth in the Sentencing Commission's binding "policy statement," USSG 1B1.13.  <u>Ebbers</u>, 2020 WL 91399, at *4—*5; 18 U.S.C. § 3582(c)(1)(A).  Here, defendant does not identify an "extraordinary and compelling reason warrant[ing]" a reduction under that definition.  18 U.S.C. § 3582(c)(1)(A).  He is thus ineligible for compassionate release.

As the Third Circuit recently held, "[w]e do not mean to minimize the risks that COVID-19 poses in the federal prison system," but the "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison cannot independently justify compassionate release"--particularly given "BOP's statutory rule, and its extensive and professional efforts to curtail the virus's spread."  <u>Raia</u>, 594 F.3d, at 597.

a.   Defendant is not eligible for compassionate
release

As a matter of law, a defendant is eligible for compassionate release only if he can demonstrate "extraordinary and compelling reasons warrant[ing] such a reduction," "consistent with applicable policy statements issued by the Sentencing Commission." Id.   Thus, as courts have recognized, Congress intended that the "Sentencing Commission, not the judiciary, determine what constitutes an appropriate use of the 'compassionate release' provision." United States v. Willingham, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (noting split in authority).   Although courts have taken different views on this issue, the government's position is that the Sentencing Commission's policy statement--USSG § 1B1.13--is thus binding on this Court.   See Dillon, 560 U.S. at 827; see, e.g., United States v. Saldana, --- F. App'x ---, 2020 WL 1486792 (10th Cir. Mar. 26, 2020); United States v. Nasirun, No. 8:99-CR-367, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11, 2020); United States v. Rivender, No. 10-CR-222, 2019 WL 3816671, at *3 (D. Conn. Aug. 14, 2019); but see, e.g., United States v. Wade, No. 99-CR-257, 2020 WL 1864906, at *4-*5 (C.D. Cal. Apr. 13, 2020).

"General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement[.]"   Eberhart, 2020 WL 1450745, *2.   Those criteria include, as relevant here:

- The medical condition "of the defendant": specifically, whether the defendant has either a "terminal illness" or a "serious physical or medical condition" that "substantially

20

diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."  USSG § 1B1.13, comment. (n.1(A)(i)-(ii));

- The "age of the defendant": specifically, whether defendant is "at least 65 years old," is "experiencing a serious deterioration in physical or mental health because of the aging process," and has served at least 10 years or 75% of his term of imprisonment.  Id., comment. (n. 1(B)); or

- "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," his illness, age, and family circumstances.  Id., comment. (n.1(D)).[3]

The global COVID-19 pandemic is not a factor specific to defendant's case at all--and, while his anxieties are certainly not frivolous, he offers no case-specific facts establishing his eligibility for compassionate release under USSG § 1B1.13.  Although defendant has health concerns, he primarily emphasizes the general risk of COVID-19: arguments that are general, wide-ranging, and would apply to essentially every unhealthy inmate presently in custody.  But, as of this filing, there are no reported cases of COVID-19 amongst inmates or staff at USP Canaan.  See BOP COVID-19 Coronavirus

---

[3] Thus, the Court may consider factors set forth in the relevant BOP regulation governing compassionate release: BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Those factors make no material difference here.

Disease Resource, available at
https://www.bop.gov/coronavirus/index.jsp (last visited April 26,
2020).

Particularly considering both how the BOP has addressed COVID-19
generally, and the lack of specific concerns at USP Canaan
specifically, defendant's circumstances are not sufficiently
extraordinary and compelling to justify a modified sentence.  Indeed,
defendant's arguments totally overlook the BOP's ability to treat
infectious disease.  Even chronic conditions "that can be managed in
prison are not a sufficient basis for compassionate release."  United
States v. Ayon-Nunez, No. 16-cR-130-DAD, 2020 WL 704785, at *2-3
(E.D. Cal. Feb. 12, 2020).  Thus, the Court "cannot assume that the
Bureau of Prisons will be unable to manage [any] outbreak or
adequately treat [defendant] should it emerge at his correctional
facility while he is still incarcerated."  Gileno, 2020 WL 1307108,
at *4 (denying compassionate-release motion in COVID-19-related case
involving a defendant who raised specific health concerns); accord
Shah, No. 10-70-CJC, ECF No. 329, at 3.  By defendant's logic, such
conditions would universally qualify convicted inmates for shorter
sentences given the present pandemic.  That is and cannot be the
case.

Defendant's specific health concerns do not alter this
conclusion.  Defendant points to myriad issues from which he suffers,
including:

- Benign prostatic hyperplasia with lower urinary track
  symptoms, which causes him to have to urinate frequently
  (Mot. at 22);

- Congestive heart failure, which caused him to suffer an episode of a fast abnormal heartbeat requiring hospitalization in May 2018 (Mot. at 21);

- A 2017 diagnosis of chronic obstructive pulmonary disease, which is treated with inhalers (Mot. at 21);

- Chronic low back pain and degenerative discs (Mot. at 22-23);

- Knee issues, which led to surgery for a knee replacement on September 19, 2018 (Mot. at 23);

- Macular degeneration (Mot. at 24); and

- Cognitive impairment, including a 2017 diagnosis of a delusional disorder.

These health concerns do not, by themselves, satisfy USSG § 1B1.13: defendant is not, for example, terminally ill, or subject to a serious and unrecoverable condition that makes him unable to "provide self-care" within a BOP facility.  USSG § 1B1.13, comment. (n.1(A)(i)-(ii); see also United States v. Vangh, 2019 WL 6907983 (D. Minn. Dec. 19, 2019) (denying motion for a 63-year-old legally blind defendant who suffered numerous ailments, even though warden recommended consideration for compassionate release; defendant failed to demonstrate how his condition has substantially diminished his ability to provide self-care within the environment of a correctional facility, and each of his problems were addressed with assistive devices).  Defendant's medical records indicate that his health issues are being adequately addressed with treatment; none of his conditions are sufficiently serious to warrant housing at a BOP medical facility. See United States v. Burgos-Martinez, 2019 U.S. Dist. LEXIS 172925 (S.D. Fla. Oct. 4, 2019) (denying motion of a 78-

year-old defendant with failing health who was not housed at a

medical center and did not state that he was unable to care for

himself).

Indeed, a motions panel of the Third Circuit recently denied a

motion for bail pending appeal based on COVID-19 concerns that were

argued to be amplified because of the defendant's specific health

problems.  In United States v. Davis, No. 19-1604, ECF No. 50 (3d

Cir. Mar. 20, 2020), appellant James Davis sought release from

custody pending appeal due to a "severe risk of death from COVID-19,"

and specifically alleged that he was 69 years old and suffered from

asthma, heart arrhythmia, high blood pressure, cystitis, and a

history of prostate cancer with radiological treatment.  See

Emergency Motion for Bail Pending Appeal, United States v. Davis, No.

19-1604, ECF No. 43-1 (3d Cir. Mar. 17, 2020).  The appellant further

argued that while incarcerated, he lived in a shared cell with bunk-

style beds, in a unit housing over 100 inmates, where inmates had

close physical interaction.  Id.  The motions panel for the Third

Circuit ruled:  "Appellant's Emergency Motion for Bail Pending Appeal

Due to Coronavirus Risk is denied.  Appellant may renew the Emergency

Motion if he is diagnosed with COVID-19."  Davis, ECF No. 50 (3d Cir.

Mar. 20, 2020).

Thus, the speculative possibility of COVID-19, even when

combined with defendant's health issues, simply does not constitute

an extraordinary and compelling reason to release defendant early

from his sentence.  Nor has defendant provided any evidence that he

will be less likely to contract COVID-19 if released (particularly

given his stated intentions of international travel).  Defendant's

circumstances are--in the present pandemic--far closer to ordinary than "extraordinary."  His motion must be denied.

> b. Defendant remains a danger to the community, likewise defeating his eligibility

Defendant's motion--even if properly exhausted, and even if defendant were otherwise eligible for relief--must also be denied because, as his illustrious criminal history reflects, he remains a danger to the community.

This Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13; see United States v. Gotti, No. 02-CR-743, 2020 WL 497987, at *6 (S.D.N.Y. 2020) (release was inappropriate regardless of extraordinary and compelling circumstances; defendant posed a continuing danger to the public); accord United States v. Urso, No. 03-CR-1382, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019); United States v. Applewhite, No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (denying compassionate release for seriously ill 80-year-oldinmate based on danger).

The record here precludes any such finding.  To the contrary, defendant poses a very real danger to the community.  Defendant is a high-profile member of the Guadalajara cartel, who trafficked millions of dollars' worth of narcotics into the United States.  He was a leader in the organization, and interacted with other powerful cartel members.  Defendant's criminal history spans several decades, including a conviction for escape from federal custody, as well as charges (that were ultimately dismissed) for his role in the abduction, torture, and murder of DEA agent Kiki Camarena.

Given defendant's criminal history and the nature of his crimes, two different judges imposed life sentences, one without the possibility of parole.  Notwithstanding that his consecutive life sentences preclude release of <u>any</u> sort, defendant now asks to be released to his family's care in Honduras, where he will not be subject to any form of supervision at all.  Under these circumstances, there can be no adequate assurance that defendant will not present a danger to the community upon release.  Indeed, for these exact reasons, the warden at USP Canaan denied defendant's request.

Nothing about the COVID-19 pandemic reduces defendant's danger.  Danger to the community is not limited to physical violence.  It can take different forms.  <u>See, e.g.</u>, <u>United States v. Reynolds</u>, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm.").  Moreover, in the current climate, irresponsible social habits also gravely endanger the community.  <u>United States v. Hir</u>, 517 F.3d 1081, 1088 (9th Cir. 2008) ("community," within the meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography).  All California residents are currently required to shelter in place and "heed the current State public health directives" to avoid the spread of COVID-19.  California Executive Order N-33-20 (March 19, 2020), <u>available at</u> <u>https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf</u>.  Such rules, though enforceable by peace officers, rely largely on voluntary compliance.  A person who ignores such rules could increase infection rates, leading to citizens' severe illness and death.  Defendant's history reflects, on a grand scale, an unwillingness to follow rules

and a disregard for the welfare of others--characteristics that now have potentially fatal consequences.

Finally, defendant's age and purported rehabilitation alone do not satisfy his burden.  The standard for compassionate release is not just whether someone is elderly and has performed well in prison.  To the contrary, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  USSG § 1B1.13, comment (n.3).  Even being a "model inmate" does not warrant an "abrupt departure from [a defendant's] current sentence." Applewhite, 2020 WL 137452, at *2.  Moreover, because there is a significant difference between doing well in prison and doing well in society, this Court, in evaluating the danger posed by defendant, cannot ignore the nature and circumstances of the offense, defendant's ties to the community, and his criminal history.  18 U.S.C. § 3142(g).  An examination of those factors weighs against release.

Defendant simply cannot be compared to the defendants in the cases on which he relies.  Those defendants established that, based on their significant medical issues and detailed release plans, they no longer represented a danger to the community.  For example, defendant Spears was serving a (mandatory, pre-Booker) life sentence, had been placed at medical facility FCI Butner for medical treatment, was diagnosed with an aggressive form of cancer along with other chronic health problems, and presented a transition plan to live with and be cared for by his family members.  United States v. Spears, No. 98-CR-208-SI-22, 2019 WL 5190877, at *1-*2 (Oct. 15, 2019). Similarly, defendant McGraw was also serving a life sentence, had

been placed at FCI Butner for medical reasons, was dependent on a wheelchair and oxygen, had chronic diarrhea, and proposed living with his sister. <u>United States v. McGraw</u>, No. 2:02-CR-00018-LJM, 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019). These release orders do not counsel in favor of granting relief to defendant.

> 4. <u>Even If Defendant Were Otherwise Eligible, 18 U.S.C. § 3553(a) Factors Do Not Support a Shorter Sentence</u>

Finally, any compassionate-release decision--even for a statutorily eligible defendant--must also consider the factors under 18 U.S.C. § 3553(a). <u>See</u> 18 U.S.C. § 3582(c)(1)(A)(i). Those factors--which this Court already considered when imposing defendant's life sentences--do not support his request for premature, permanent release. They support his original sentence.

Defendant makes essentially three arguments in this regard. First, he points out that his drug conspiracy and distribution convictions, while serious, did not involve violence. (Mot. at 29.) However, not only was this likely considered by the sentencing courts, it is true in only a narrow, literal sense. Defendant may not have been convicted for crimes of violence, but there can be no serious dispute that the narcotic trafficking activities of the Guadalajara cartel, a criminal enterprise for which defendant convicted of organizing, entailed a great deal of violence. Second, defendant asserts that his sentences were improperly influenced by the criminal charges arising from the Kiki Camarena murder case. This is conjecture; given defendant's long criminal history and the sheer scale of the crimes for which he was convicted, there was plenty of support for imposing a life sentence even without the Camarena case.

By imposing two consecutive life sentences, the sentencing courts clearly intended that defendant spend the remainder of his life in federal custody.  Granting compassionate release would negate that.  Moreover, defendant's plan to live with his adult children in Honduras means that he would not be subject to any form of supervision upon release. The law, and the specific facts of defendant's case, neither demand nor endorse that result.

## IV.   CONCLUSION

Defendant's motion for compassionate release should be dismissed.  Even if the Court could reach the merits of defendant's motion, the motion should be denied for the reasons set forth above.