MARK WINDSOR (Bar No. 190589)
65 N. Raymond Avenue, Suite 320
Pasadena, California 91103
Telephone: (626) 792-6700
Facsimile: (626) 956-8900
Email: mark@windsorlaw.us

Attorney for Defendant
JUAN RAMON MATTA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. 85-cr-00606-PAR, 88-cr-00129-WJR |
| Plaintiff, | |
| v. | **DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A); EXHIBITS** |
| JUAN RAMON MATTA | |
| Defendants. | |

Defendant Juan Ramon Matta-Lopez, by and through his counsel of record, Mark Windsor and Mark Adams, here files his reply to the government's opposition to his motion for compassionate release.

Dated: May 4, 2020                    Respectfully submitted,


                                      /s/ *Mark Windsor*
                                      MARK WINDSOR, Counsel for
                                      JUAN RAMON MATTA

1

1    **I. This Court has Authority to Reduce Mr. Matta's Sentence Under 18 U.S.C. §**

2    **3582(c)(1)(A).**

3          The government argues in its opposition that, "Because defendant was convicted before

4    November 1, 1987, he is subject to 18 U.S.C. § 4205(g) rather than 18 U.S.C. § 3582." (Gov. Opp.

5    p.9, ln 16). Neither part of this statement is true. First, Mr. Matta was not convicted before November

6    1, 1987. In fact, while the indictments in the two cases at issue allege acts committed before that date,

7    Mr. Matta was not abducted and forcibly brought to the United States for prosecution until April of

8    1988, and not convicted and sentenced for the crimes at issue here until 1990 and 1991.[1] Second, Mr.

9    Matta is not subject to 18 U.S.C. § 4502(g).

10         Mr. Matta has been sentenced to life without the possibility of parole (85-CR-606). The

11   Bureau of Prisons therefore considers Mr. Matta categorically ineligible for relief under 18 U.S.C. §

12   4502(g), and under that analysis the statute simply does not apply to him at all. See 28 C.F.R. §

13   571.64 ("The Bureau of Prisons cannot initiate such a motion [for compassionate releast] on behalf of

14   federal offenders who committed their offenses prior to November 1, 1987, and received non-

15   parolable sentences.") The government itself hastens to make this point (Government's Opposition,

16   pp11-12), essentially arguing that this Court should interpret the statute in a way that would preclude

17   Mr. Matta from any possibility of even being considered for Compassionate Release. Since § 3582

18   clearly provides for compassionate release for inmates sentenced to life under post-1987 law[2], and

19   such a sentence in no other material way differs from a life without parole sentence under "old law"

20   prior to 1987, this cannot have been the intent of congress in drafting the relevant amendment to the

21   1984 Act, and it certainly was not the intent of congress in 2018 when it amended the statute to allow

22   defendant-initiated petitions for release.

---

23   [1] This distinction is relevant to the analysis that follows regarding statutory construction and congressional intent, as congress clearly intended to include inmates like Mr. Matta at the time the Act was originally passed, but the language

24   in the amendment the government relies on for their argument that Mr. Matta is barred from relief under § 3582, which originally referred to the date of *sentencing*, was ultimately changed to refer to the date the crime was *committed* to avoid

25   ex post facto problems. The government corrects itself later in its opposition and refers to the date of commission throughout most of their argument.

26

27   [2] 18 U.S.C. § 3582(c) states in relevant part: "The court may not modify a term of imprisonment once it as been imposed except that – (1) *in any case* – (A) the court…may reduce the term of imprisonment…if it finds that – (i)

28   extraordinary and compelling reasons warrant such a reduction…." (emphasis added). See also, e.g., *United States v. Curtis*, 2020 WL 1935543 (Dist. Ct., District of Columbia).

2

There are two circumstances in which this court may look beyond the express language of a statute in order to give force to Congressional intent: where the statutory language is ambiguous, and where a literal interpretation of that language would thwart the purpose of the over-all statutory scheme or lead to an absurd result. *International Telephone and Telegraph Corporation v. General Telephone & Electronics Corp.*, 518 F.2d 913, 917-18 (9th Cir.1975). Because the latest amendment to 18 U.S.C. § 3582 under the First Step Act of 2018 does not have an effective date, and because the statute by its terms applies in "any case," arguably the first category applies. But far more directly relevant is the second category, because to literally interpret the amendment to the original 1984 act that limited applicability to offenses committed on or after November 1, 1987 as controlling under the circumstances of this case would *both* thwart the express purposes of the overall statutory scheme and lead to an absurd result.

First, it was the intent of congress to add the amendment that changed the effective scope of the Sentencing Reform Act of 1984 from applying to "all federal sentencing" after its effective date to any crime "committed" on or after the effective date solely to avoid ex post facto problems.  As the effective date of the Sentencing Reform Act approached, congress and the Justice Department realized that as written (applying to all setencings after the effective date) the act was likely to be construed as an unconstitutional ex post facto law with respect to those sentenced for crimes committed before the effective date. Congress decided to amend the legislation. The senate met on October 28, 1987 to consider, among other provisions, the relevant amendment. There was no debate. 133 Cong. Rec. S29666-01 (1987). Every subsequent discussion of the amendment justified it solely in terms of avoiding the ex post facto problem. *See* 133 Cong. Rec. H10014-02 (1987); 133 Cong. Rec. S16644-03. But for the ex post facto concern, the Act would have applied to Mr. Matta at his sentencings in both cases before this Court.

An 1890 Supreme Court case, *In Re Medley*, provides an excellent and concise discussion of what constitutes an impermissible ex post facto law:

> The term 'ex post facto' law, as found in the provision of the constitution of the United States, to-wit, that 'no state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts,' has been held to apply to criminal laws alone, and has been often the subject of construction in this court. Without making extracts from these decisions, it may be said that any law which was passed after the commission of the offense for which the party is being tried is an ex post facto law when it inflicts a greater punishment than the law annexed to the crime at the time it was committed, (Calder v. Bull, 3 Dall. 386, 390; Kring v. Missouri, 107 U. S. 221, 2 Sup. Ct. Rep. 443; Fletcher v. Peck, 6 Cranch, 87;) or which alters the situation of the accused to his disadvantage; and that no one can be criminally punished in this

3

country except according to a law prescribed for his government by the sovereign authority before the imputed offense was committed, ***or by some law passed afterwards, by which the punishment is not increased.*** (emphasis added). *In Re Medley*, 134 U.S. 160, 170-171 (1890).

18 U.S.C. § 3582(c) does not increase punishment, but in fact is designed to reduce a sentence, the severity of which is no longer warranted due to circumstances developing after the sentence is imposed. The application of this statute to Mr. Matta therefore poses no ex post facto problem, and congress therefore did not intend, in amending the 1984 statute, to bar application of this specific subpart of the chapter to Mr. Matta. This is clear from the record at the time, but it is made even more clear today, by passage of the the amendments to § 3582 contained in the First Step Act of 2018, which were expressly crafted to increase the use of the Compassionate Release safety valve.

The impetus for the new amendments had much to do with the utter refusal of BOP over the past decades since the 1984 Act to give any real effect to the purposes of compassionate release. We have previously outlined this in our opening brief (at pp 8-10) in the context of establishing that the current pandemic can be a basis for release. It bears a brief and amended summary here, relating as it does to the overall statutory scheme.

Rather than simply filter frivolous requests and let judges decide the merits of compassionate release requests, the BOP prior to enactment of the First Step Act had made itself the arbiter under compassionate release, refusing for decades to place more than a few dozen sentence-reduction motions a year before the courts, robbing judges of the power Congress intended.

In light of this intransigence, several concerted efforts were made to urge BOP to expand compassionate release, all of which were utterly ignored by the bureau. Since 1984, the agency has abided the miserly "death rattle rule"[3] in dispensing compassionate release: according to DOJ's own inspector general, the BOP files motions only for dying prisoners in their last months of life and virtually no one else—despite their own policy saying many others qualify.[4] In a 2013 report, the OIG

---

[3] *Sentence Reduction Mechanism in Determinate Sentencing System: Report of the Second Look Roundtable*, 21 Fed. Sent. Rep. 211, 216, 2009 WL 8129932 (Feb. 2009); Mary Price, *A Case for Compassion*, 21 Fed. Sent. Rep. 170, 171 (Feb. 2009) (describing how the Bureau of Prisons brings "generally no more than twenty" compassionate release petitions each year, and describing the Department of Justice's death-rattle rule, which states that compassionate release should be reserved for those who are terminally ill).

[4] In 2019, the BOP filed 55 motions out of 1,735 received; 45 were terminal inmates, 11 were bed-ridden and debilitated; no motions were under the other medical, caregiver, spouse, or "other" categories. *See* Prince Decl., Attach. C (Letter from Kathleen Hawk Sawyer, Dir., Bur. of Prisons, to Jerrold Nadler, Chairman, House Jud. Comm. (Feb. 13, 2020)).

4

called the compassionate release program "poorly managed," and found most prisons granted only applications for terminal inmates with 6–12 months to live (depending on whatever the local warden felt), and over a 6-year look-back period, not a single other prisoner.[5]

Two years later, the OIG fired off another critical report, finding that while BOP claimed to have "expanded [its] compassionate release policy," the widely-touted expansion resulted in the release of "only two inmates."[6] One warden, in a moment of honesty, told the OIG that the expansion was "a policy that sounds good but does not accomplish much."[7] Years of OIG reports and criticisms changed nothing.

After the OIG failed to spur change, the Sentencing Commission tried its hand. It started where the OIG left off, noting BOP's "lengthy review" of applications was slow, produced abysmally "low approval rates," and the BOP "ignores the often precipitous decline in health or circumstances [that] can occur after imprisonment."[8] To loosen BOP's grip, the Commission broke down "extraordinary and compelling" reasons into four discrete categories *medical condition of the defendant*, *age of the defendant*, *family circumstances*, and in a clear attempt to broaden releases, a catch-all category—*other reasons*. Still nothing changed.

Next, individual senators pleaded with BOP to broaden its compassionate release policy. In August 2017, a dozen senators—a bipartisan group—told BOP they were "deeply concerned that BOP is not fulfilling its role in the compassionate release process."[9] They put it bluntly: "BOP needs to take a hard look at expanding the use of compassionate release." BOP took no hard look, and still

---

[5] Dept. of Just., Office of the Inspector General, *The Fed. Bur. of Prisons Compassionate Release Program*, at ii (Apr. 2013)(available at: https://bit.ly/2xfKomH). The report found there were no checks on wardens' ability to deny requests: "BOP does not conduct any systematic reviews of decisions made by Wardens or Regional Directors to ensure that they are consistent with each other and with the BOP's Program Statement and the underlying statutory authority." *Id.* at iii.

[6] Dept. of Just., Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at iii (May 2015) (available at: https://bit.ly/39YFBTU) ("Aging inmates could be viable candidates for early release, resulting in significant cost savings; but BOP policy strictly limits those who can be considered and, as a result, few have been released.").

[7] *Id.* at 46.

[8] U.S.S.G. § 1B1.13, amend 799 (Nov. 1, 2016) (available at: https://bit.ly/39WniyO).

[9] Letter from Sen. Brian Schatz et al. to Dr. Thomas Kane, Dir. Bur. of Prisons (Aug. 3, 2017) (available at: https://bit.ly/39XFGHo).

hasn't. In 2019, BOP received 1,735 applications and allowed the judiciary to look at just 55.[10] That is 3%. Last year, despite the OIG reports, the Sentencing Commission's amendment, and direct prodding from senators, BOP approved *zero* releases in the elderly-medical category (of 204 applications), *zero* releases under the caregiver category (of 120 applications), and despite the broad catch-all, precisely *zero* in the other-reasons category (of 330 applications).[11]

By cutting BOP out of the role of final arbiter of compassionate release petitions and allowing for direct petitioning of the Court by defendants, it is clear in the context of the above that congress has given up on convincing the BOP to faithfully execute the purpose of compassionate release and has no faith the agency will ever do so.[12] In light of the clear intent of congress to expand application of and eligibility for compassionate release through eliminating BOP control of the process and providing inmates direct access to the courts, combined with the lack of any effective date bar in the new amendments, the government's position that the Court should interpret the First Step Act such that Mr. Matta should be barred from any consideration for release, or forced to await a petition from an agency who has not only demonstrated hostility to early release but has officially declared it will never provide such relief for Mr. Matta, lacks any rational basis.

It is incontrovertible that one of the main specific goals of the compassionate release provision as it has developed is to provide an opportunity for old, sick inmates who have already served long sentences to leave incarceration where courts deem it appropriate. *See*, e.g., U.S.S.G. § 1B1.13. Because congress clearly intended in the First Step Act to eliminate the ability of BOP to preclude inmates from being considered for compassionate release by the courts, and because the BOP has taken a position that precludes old law inmates in Mr. Matta's position from ever being considered for early release under old law provisions, precluding application of § 3582 to Mr. Matta and similarly situated inmates would create a manifestly absurd result. Such a decision would render generally

---

[10] Prince Decl., Attach. C (Letter from Kathleen Hawk Sawyer, Dir., Bur. of Prisons, to Jerrold Nadler, Chairman, House Jud. Comm. (Feb. 13, 2020)).

[11] *Id.* at 2.

[12] In recent months, BOP has done nothing to dispell this conclusion. On March 23, 2020, a bi-partisan group of senators, dismayed that the "BOP has opposed the vast majority of petitions" for compassionate release, wrote a letter urging the agency to "interpret[] [its policy] more broadly" and find that "vulnerability to COVID-19" was an extraordinary and compelling circumstance. (Letter from Senators Richard Rubin & Chuck Grassley, et al., to Att. Gen. William Barr & Dir. Michael Carvajal, Bur. of Prisons (Mar. 23, 2020) (available at: https://bit.ly/34mHVDb).  BOP has thus far ignored that common sense advice: it has made no changes to its policy. (Bur. of Prisons, *Compassionate Release / Reduction in Sentence: Procedures for Implementation*, Program Statement 5050.50 (Jan. 17, 2019) (available at: https://bit.ly/2Xmss4m).  To our knowledge, BOP has made not a single motion for compassionate release due to coronavirus vulnerability.

older, more vulnerable and likely sicker inmates who are far more likely to have served greater time in prison *entirely barred* from release based solely on the date their crimes were committed, whereas generally younger inmates likely to have served less time would have access to the relief.[13]

Furthermore, given the substance, language and the context in which the amendments to the statute were enacted, barring application of compassionate release to Mr. Matta would thwart the express purposes of the overall statutory scheme. This Court has the authority to construe the statute in a way that gives effect to the intent of congress and avoids an absurd result by applying the remedies we here request. The provisions of 18 U.S.C. § 3582(c) as amended by the First Step Act of 2018 should apply to Mr. Matta.

## II. The Government's Exhaustion argument is Moot and Further Delay is Pointless.

Under 18 U.S.C. § 3582 ( c) (1)(A), this Court may reduce Mr. Matta-Ballesteros's sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*…." Id. (emphasis added). This language is clear and unambiguous, and with it § 3582 contains no true exhaustion scheme at all. Instead, this section contains a 30-day right-of-first refusal rule, as Judge Rakoff noted some weeks ago. *U.S. v. Haney*, __F. Supp. 3d __, 2020 WL 1821988, at *3 (S.D.N.Y. 2020) (§ 3582 "requires the defendant to *either* exhaust administrative remedies *or* simply to wait 30 days….") (emphasis in original). Tellingly, while the U.S. Attorney's Office in the Central District of California seems to take a different view, the U.S. Attorneys in the Southern District of New York appear to agree with Judge Rakoff. *See* Exhibit G. On March 27, 2020, counsel for Mr. Matta delivered a request for compassionate release to the Warden at USP Canaan via electronic mail. As has previously been established by the government, the Warden received that request on March 30, 2020. On March 31, 2020, the Warden denied Mr. Matta's request for compassionate release. For purposes of this motion and the issue of exhausing remedies, these uncontested facts are all that is required to resolve the matter, as 30 days have now passed since the request was delivered to the warden of Mr. Matta's place of incarceration. In addition, however, counsel for Mr. Matta-Ballesteros received the Warden's denial of the request on April 8, 2020, and on that same day delivered by electronic mail

[13] This result also conflicts with other important components of the overall statutory scheme, such as 18 U.S.C. § 3553(a)(6), which specifically instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

7

(NERO/ExecAssistant@bop.gov) an appeal of the denial to the email address provided on the BOP website for the Regional Director David Paul for the Northeast Region of the BOP.[14] See Exhibit H. No response was ever provided to this email.

Therefore, Mr. Matta has exhausted his remedies with the BOP. Furthermore, according to the government's opposition and as previously discussed, the BOP would refuse to apply §3582(c) to Mr. Matta, and would further refuse to move for compassionate release for any inmate in Mr. Matta's position under any circumstances under §4205(g), having been committed to prison under a non-parolable sentence pursuant to old law.[15]  By this logic, no remedies exist at the BOP for Mr. Matta to exhaust in the first place, adding to our argument under futility.[16] Any further delay in proceeding on the merits of this motion would therefore be a pointless waste of time, and such delay would further increase the risk of serious illness or death for Mr. Matta.

### III. Release is Supported by Sentencing Commission Policy[17]

Contrary to the government's assertion, the current pandemic is not, in fact, the main argument we put forward for Mr. Matta's relief, but is one of several grounds upon which he clearly qualifies for compassionate release. In our opening brief, we couched our arguments under headings created by BOP Program statements, which are more restrictive than and easily convert to the policy statements contained in U.S.S.G. § 1.13. In fact, of the four categories of reasons outlined in U.S.S.G. §1b1.13, Application Note 1, *any one* of which alone would qualify for compassionate release, Mr. Matta has clearly demonstrated he qualifies under three of them:

- **His medical condition**, which, according to his medical records, qualifies him under all three subcategories: He is suffering from serious physical *and* medical conditions, suffering from serious functional *and* cognitive impairment, and is experiencing deteriorating physical and mental health because of the aging process, all of which substantially diminish his ability to provide self-care within the prison environment,

---

[14] See https://www.bop.gov/locations/regional_offices/nero/ last viewed May 1, 2020.

[15] Gov. Opp. p.9, ln 16-22.

[16] Defendant's Motion, pp 17-20

[17] The government argues that the policy statements in U.S.S.G. § 1.13 "are binding on a court determining eligibility." Gov.Opp., 13. We do not agree, but this issue is not relevant here – because Mr. Matta clearly qualifies under several categories for compassionate release outlined by the Sentencing Commission, as discussed, *infra*.

and Mr. Matta is not expected to recover from many, or possibly any of these conditions (1(A)(ii));

- **His age** (75) and the length of time he has already served (32 years total, almost 30 years on the instant charges) (1(B)), and;

- The "Other Reason" of his heightened risk of death when he becomes infected with **COVID-19** because he is a member of at least five categories of "at risk" individuals – He suffers from cardiovascular disease, Chronic obstructive pulmonary disease (COPD – lung disease), obesity, kidney damage due to sepsis, and advanced age.  (1D)

Mr. Matta is almost blind, he suffers from excruciating knee and back pain, has difficulty walking without the assistance of a walker and often requires a wheelchair (which he has been denied because it is too large to maneuver in the prison environment); his kidneys have been compromised by recurring sepsis that has consistently delayed treatment of his ongoing prostate issues that have not resolved despite surgery; he suffers from chronic sleep deprivation due to the need to urinate frequently; his heart is failing; he often requires oxygen and enhalers to breathe properly after minor exertion; he is suffering mental decline and delusional disorder likely caused by a combination of advanced age and 25 years in solitary confinement, and his inability to exercise has contributed to his current morbid obesity. There can simply be no doubt that these conditions, separately and certainly in combination, "substantially diminish the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover." U.S.S.G. § 1B1.13, n.1(A)(ii).

Also, as argued in the opening brief, Mr. Matta's extreme vulnerability to the ravages of the current pandemic, combined with the heightened risk of infection to anyone currently incarcerated, qualify under "Other Reasons" category of Commentary 1(D). Recent studies clearly indicate that Mr. Matta, due to his health conditions, is at far greater risk of requiring hospitalization and death in the event he contracts the disease. A recent report on hospitalization risk factors for COVID 19 indicated: "Among 178 adult patients with data on underlying conditions as of March 30, 2020, 89.3% had one or more underlying conditions; the most common were hypertension (49.7%), **obesity (48.3%), chronic lung disease (34.6%),** diabetes mellitus (28.3%), and **cardiovascular disease (27.8%)."** (emphasis added). The report also found that older patients had higher rates of

9

hospitalization.[18] Another report compiling data from the COVID-19 outbreak in China found that while the overall death rate from the disease was 2.3%, those aged 70-79 had an 8% chance of death, and those with cardiovascular disease died from the virus at a rate of 10.5%.[19] Mr. Matta has a exponentially greater risk of hospitalization and death in the event he contracts the disease over the average inmate.

### IV. Mr. Matta Is Not A Danger To Anyone.

The government argues that, based on his "illustrious criminal history," his status as "a high-profile member of the Guadalajara cartel," and because Mr. Matta may conceivably exhibit "irresponsible social habits" in a pandemic, he should be denied release as a danger to the community as a whole. This argument is without merit.

The government proclaims in multiple parts of its brief that Mr. Matta was "a high-ranking member of the Guadalajara cartel." This assertion is at best a gross exaggeration, and more likely simply false. The indictments, and even the government version of events in the PSR includes no such assertion. What the charges did allege was that Mr. Matta was a close business associate of Mr. Felix-Gallardo, who was the head of the Guadalajara cartel. Mr. Matta and Mr. Felix-Gallardo conferred on many occasions regarding the transportation of cocaine from Colombia. This much was established, but there is no evidence that Mr. Matta had any authority, control or interest in the inner workings of Mr. Felix-Gallardo's cartel, which he alone controlled.  The "enterprise" that Mr. Matta was convicted of leading was a network of couriers consisting primarily of air pilots, a fleet of aircraft, and a team of loaders and off-loaders who focused their endeavors on the successful transportation of large quantities of cocaine from Colombia to the United States. His earlier routes, according to the 1985

---

[18] Garg S, Kim L, Whitaker M, et al. Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020. MMWR Morb Mortal Wkly Rep 2020;69:458–464. DOI: http://dx.doi.org/10.15585/mmwr.mm6915e3external icon.

[19] Wu Z, McGoogan JM. Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72 314 Cases From the Chinese Center for Disease Control and Prevention. *JAMA*. 2020; 323 (13): 1239–1242. doi:10.1001/jama.2020.2648

1
2
3
4
5
6
7

indictment, went through the Bahamas and had nothing to do with Mr. Felix-Gallardo and his cartel. Only later, after the Bahamain routes became compromised and costly, did Mr. Matta coordinate with Mr. Felix-Gallardo, according to the 1988 case, and bring the drugs through Mexico. Regardless, this was all over 36 years ago, the Guadalajara cartel no longer exists, Mr. Felix-Gallardo has been in prison in Mexico for over 20 years, and Mr. Matta has had no contact with any of his alleged coconspirators or any other members of the charged enterprise since his trials. Even the Bureau of Prisons agrees that Mr. Matta is a low risk with regard to recidivism.[20]

8
9
10
11
12
13
14
15
16

Mr. Matta's other criminal history consists of illegal entry, pickpocketing, and walking away from a prison camp in the late 1960's and early '70s. These additional, 50-year-old nonviolent crimes do nothing to support the government's position. As for the allegation that Mr. Matta should not be released because he may not conform to social distancing directives, first, the government should look to the conditions imposed on inmates throughout the BOP right now, at the height of the pandemic, and consider whether this approach may perhaps be hypocritical. Mr. Matta's current circumstances place him at far greater risk not only of contracting the disease but of spreading it to others, than he would be exposed to if he were released. And no one would have more to lose by irresponsible behavior than Mr. Matta himself.

17
18
19
20
21
22
23
24
25
26

The government also points out that Mr. Matta would not be subject to supervision in Honduras. First, compassionate release does not require a period of supervision upon release. Secondly, Mr. Matta would request home confinement in the alternative, as many of his direct family members are United States Citizens and are willing to provide for him here, but the government itself, having abducted him and brought him to this country by force, has placed an immigration hold on him and will no doubt move to deport him upon his release. If the government removes the hold and allows his legal presence in the United States until he completes a period of supervised release or home confinement, Mr. Matta's family would immediately arrange for suitable housing. Barring this, and especially in the context of the circumstances of Mr. Matta's most recent arrival in the U.S., the government has no standing to complain about his planned place of residence after release.

27
28

[20] Decl. R. Williams, pg. 2, paragraph 8, filed with Gov. Opp.

11

1    Finally, Mr. Matta suffers from many chronic, debilitating health problems from which he will

2    not recover. If he is released, he will likely spend most of his time and energy focused on his family

3    and his health.

4    **V.    Mr. Matta's release from Prison after 32 years and 25 years of Solitary
         Confinement Would Create No Issues with regard to Sentencing Disparity, Or Respect
5        for the Law.**

6

7    On April 6, 1988, after being forcibly removed from his home in Tegucigalpa, Honduras by

8    Honduran military personnel and United States Marshals, Mr. Matta was taken via circuitous air route

9    from Honduras to the United States Penitentiary, Marion and placed in the institution's hospital. (*See*

10   attached Exhibit, Inmate History Quarters, p. 7.) Mr. Matta later provided testimony and submitted

11   photographs to support his allegations of torturous treatment by government agents during his

12   transportation to USP Marion.[21]  There is some dispute as to what happened to Mr. Matta on the cargo

13   plane that brought him,[22] but whatever happened, it caused Mr. Matta to remain in that hospital for

14   almost 4 months. (*Id*. p. 7.)[23]

15

16   From that time, Mr. Matta was placed in some form of solitary confinement for 25 years,

17   almost continuously. (*See* attached Exhibit, Inmate History Quarters). At USP Marion, Mr. Matta was

18   housed in solitary cells within the I- and G-Units. During the trial proceedings, he was kept in similar

19   administrative detention units at USP Lompoc. After his convictions and sentencing in 1990 and

20   1991, he remained at USP Marion from May 10, 1991 through February 13, 1995, before being

21

22

23        [21] During an evidentiary hearing Mr. Matta told the district court that while he was transported to the United
          States from Honduras he was bound and hooded by U.S. Marshals. He stated that he was also "beaten and tortured by a
24        stun gun applied to various parts of his body, including his feet and genitals." (*See* United States v. Matta-Ballesteros
          (1995) 71 F.3d 754, 761.)
25
          [22] However, the government did not dispute that Mr. Matta was forcibly abducted from his home in Honduras.
26        (Matta-Ballesteros, *id*. at 761.)

27        [23] Language throughout the Ninth Circuit's decision indicates that they believed Mr. Matta's account of events.
          For instance, the Court states, "The circumstances surrounding Matta-Ballesteros's abduction, while disturbing to us and
28        conduct we seek in no way to condone…" (Matta-Ballesteros, *id*. at 762 - 764.)

12

transferred to United States Penitentiary, Administrative Maximum Facility ("ADX") in Florence, Colorado, a supermax prison. During the last three years of his time at USP Marion, Mr. Matta was housed in E-, F- and G-Units, some of the most restrictive units at USP Marion. (*See* Stephens C. Richards, *USP Marion: A Few Prisoners Summon the Courage to Speak*, Laws (2015; 4; 91–106; doi:10.3390/laws4010091) University of Wisconsin - Oshkosh, *available at* https://www.mdpi.com /2075-471X/4/1/91/htm (accessed 5/1/2020).)

USP Marion is considered a disciplinary prison, where all the cells are used to isolate individual prisoners for years at a time. (*See* Stephen C. Richards, *USP Marion - The first federal supermax*, The Prison Journal (March 2008; 88; 6; doi: 10.1177/0032885507310529) University of Wisconsin - Oshkosh, *available at* http://tpj.sagepub.com/cgi/content/abstract/88/1/6 (accessed 5/1/2020)). What is known as "general population" does not exist there. (*Id.*) The prisoners do not leave their cell blocks, there is no "controlled movement," and since prisoners rarely ever leave their cell blocks, they may never see the gym or yard. (*Id.*) The cell itself measures 6 x 8 feet. (*Id.*) Meals are taken through the bars and eaten in the cell. There is no congregate dining. (*Id.*) Beds are concrete slabs with pads laid on top of them as mattresses. (*Id.*) At each of the four corners of the bunk is a ring so that the men can be strapped down whenever prison authorities think that it is appropriate. (*Id.*) For 6 years Mr. Matta-Lopez endured the physical and psychological torture caused by solitary confinement, constant observation and harsh treatment by the prison staff at USP Marion.

Mr. Matta was then transferred from USP Marion to the brand new ADX facility in Florence, Colorado on February 13, 1995, becoming one of it's first inmates. ADX, sometimes referred to as the "Alcatraz of the Rockies," can house up to 500 prisoners in its eight units. Inmates spend their days in 12 x 7-foot cells with thick concrete walls and double sets of sliding metal doors (with solid exteriors, so prisoners cannot see one another). (*See* Mark Binelli, *Inside America's Toughest Federal Prison*, The New York Times Magazine (March 26, 2015) *available at* https://www.nytimes.com/2015/03/29/

13

magazine/inside-americas-toughest-federal-prison.html (accessed 4/27/2020).) A single window, about 3 feet high but only 4 inches wide, offers a notched glimpse of sky and little else. (*Id*.) Each cell has a sink-toilet combo and an automated shower, and prisoners sleep on concrete slabs topped with thin mattresses. (*Id*.) All meals come through slots in the interior door, as well as any face-to-face human interaction (i.e. guards, psychiatrist, chaplain, etc.). (*Id*.)

The Control Unit (a.k.a. Bravo Unit or B-Unit) and the special housing units ("SHU") are the most secure units at ADX. Prisoners are always isolated, including during recreation, and remain in their cells for 23 to 24 hours a day. Inmate's behavior and compliance with the institutional and unit rules are assessed monthly. (*See* District of Columbia Corrections Information Council, *USP Florence Administrative Maximum Security (ADX) Inspection Report and USP Florence-High Survey Report* (October 31, 2018) available at https://cic.dc.gov/sites/default/files/dc/sites/cic/publication /attachments/ Florence%20ADMAX%20Inspection%20Report%20and%20BOP%20Response%20-%2010.31.18.pdf (accessed on 5/1/2020).) If an inmate does not maintain clear conduct for an entire month, then the inmate does not receive time served for any days in that month. (*Id*.) Robert Hood, the warden of ADX from 2002 to 2005 described ADX as "a clean version of hell." (*See* Binelli, *supra*.)

According to a 2014 Amnesty International report, more than 40 states now operate supermax prisons. (*See* Binelli, *supra*.) On any given day, there are 80,000 U.S. prisoners in solitary confinement. (*Id*.) Solitary confinement is defined by Stuart Grassian as the confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction, and he found that it can cause severe psychiatric harm. (*See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, Washington University Journal of Law & Policy (January 2006) *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi ?article=1362&context=law_journal_law_policy (accessed 4/27/2020).)

14

The Supreme Court of the United States long ago described solitary confinement as "[A]n additional punishment of the most important and painful character." (*In re Medley*, supra, at 171 (1890). The *Medley* Court described how inmates had reacted to solitary confinement in U.S. nineteenth-century prisons: "A considerable number of prisoners fell, after even a short confinement, into a semifatuous condition, from which it was next to impossible to arouse them […] and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." (*Id*. at 168.)

In *Psychiatric Effects of Solitary Confinement,* Dr. Grassian's clinical studies of inmates found a specific psychiatric syndrome associated with solitary confinement - a delirium. (Grassian, *supra*, pages 335-338.) Delirium, he explains, is a syndrome characterized by a decreased level of alertness and electroencephalogram (EEG) abnormalities.[24] (*Id*. at 338.) Some symptoms of delirium, according to Dr. Grassian, are perceptual distortions, illusions, and hallucinations. (*Id*. at 335.) He observed that these symptoms are "virtually found nowhere else" when compared to other primary psychiatric illnesses. (*Id*. at 337.) "[D]elirium is a syndrome which is known to result from the type of conditions […] which are characteristic of solitary confinement." (*Id*. at 338.) "[A]lthough many of the acute symptoms suffered by these inmates are likely to subside upon termination of solitary confinement […] many will likely suffer permanent harm as a result of such confinement." (Id. at 332.)

A 2006 review of literature on the psychological effects of solitary confinement stated that "[n]early every scientific inquiry into the effects of solitary confinement over the past 150 years has concluded that subjecting an individual to more than 10 days of involuntary segregation results in a

---

[24] An EEG is a test that uses metal discs called electrodes attached to the scalp to detect electrical activity. It tracks the electrical pulses of the brain. EEG is used to diagnose epilepsy and many other brain disorders. (See Mayo Foundation for Medical Education and Research, *Overview About EEG (electroencephalogram)*, *available at* https://www.mayoclinic.org/tests-procedures/eeg/about/pac-20393875 (accessed 5/3/2020).)

distinct set of emotional, cognitive, social and physical pathologies." (*See* Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, Crime & Justice (2006; Vol. 34, No. 1, pp. 441-528) The University of Chicago Press *available at* https://www.jstor.org/stable/10.1086/500626 (accessed 5/1/2020.).) Further, "[n]umerous literature reviews have noted that scientists from diverse disciplinary backgrounds, working independently and across several continents, and over many decades, have reached almost identical conclusions about the negative effects of isolation in general and solitary confinement in particular." (*See* Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, Crime and Justice (2018) The University of Chicago, (WL 47 Crime & Just. 365).)

Mr. Matta was held in solitary confinement almost continuously from April 6, 1988 to February 14, 2013, while incarcerated at USP Marion and ADX. This simple fact belies any argument by the government or BOP that Mr. Matta's release after 25 years of systematic psychological abuse and 32 years total continuous custody time would somehow fail to reflect the seriousness of his drug crimes or create any sentencing disparity issues with similarly situated inmates. [25]

## V.    Conclusion.

There is one thing upon which we all may rely: things change. With the passage of time, inevitably there comes transformation. Recognition of this unassailable fact of earthly existence is the foundation of our compassionate release law. Since the day that Mr. Matta was seized from his home on a side street in Tegucigalpa, interrogated for hours on a military cargo plane as it brought him to the United States, and then dumped into the hospital wing of USP Marion, 32 years and a great deal of transformation has occurred. Chief among these changes, our society - and congress and the courts

---

[25] In 2018 it was reported that 92% of the inmates at ADX were there for serious violations of BOP conduct and rules. (See District of Columbia Corrections Information Council, *USP Florence Administrative Maximum Security (ADX) Inspection Report and USP Florence-High Survey Report* (October 31, 2018).) Review of Mr. Matta's BOP conduct records, which consist of a sprinkling of minor infractions involving phone abuse and the like over the entire 30-year period, clearly demonstrate that this was not the reason Mr. Matta was placed at ADX, putting him in a group of approximately 30-40 inmates placed in the most severe conditions in the BOP without disciplinary justification.

with it -  has turned to address the long-brewing crisis of overcrowded prisons and draconian sentencing laws that have torn families and communities apart, destroyed lives, emptied government coffers, and has now been whipped into a perfect storm of terror and misery by a global pandemic that is likely to change the way we live our daily lives for years or even decades to come.

Similarly, Mr. Matta has changed. Long ago he was convicted in two separate CCE indictments alleging essentially identical conduct – that he ran a vast enterprise dedicated to the transportation of large quantities of cocaine into the United States through the use of a fleet of airplanes and his contacts in Colombia, the Bahamas, Mexico and Spain. The planes are now gone, the contacts are now dead or in prison, and Mr. Matta has been ravaged by age and decades of high-security confinement, such that he is going blind, suffers from hallucinations and delusions, has trouble breathing, is in constant pain and can barely walk. He also now lives in fear that any day he may be attacked by a virus that will assault his lungs, heart and other organs and trigger his body to slowly, painfully and inexorably squeeze the life out of itself.  All with the knowledge that in his current environment there is little Mr. Matta can do to protect himself from this threat, and that he must instead rely on his captors to protect him – captors who have proven over the past months of rampant spread and devastating outbreaks to be unequal to the task.[26]

Despite these undeniable transformations, the United States Attorneys Office and the Bureau of Prisons defiantly cling to the fantasy that nothing has changed at all. They appear to take the view that Mr. Matta's past criminal conduct of illegal entry, pickpocketing, and walking away from a prison camp in the late 1960's and early '70s, and running a drug smuggling network in the mid-1980's, combined with the now discredited charges regarding the Camarena case, make him unfit to be released - ever. The fact that Mr. Matta can barely walk across the room without the assistance of an inhaler and a walker the government finds irrelevant, but the fact that Mr. Matta ran a drug transporting scheme 32 years ago makes him a danger to society for all eternity. The government argues that this court should never even consider altering the life sentences imposed on Mr. Matta in 1990 and 1991, two sentences that were imposed for running essentially the same enterprise, under the

---

[26] *See, e.g.*, recent events at Lompoc, Terminal Island, Ft. Worth facilites.

cloud of highly inflammatory and widely publicized allegations of involvement in the kidnapping and murder of an American DEA agent in Mexico at the height of drug war frenzie in the United States – allegations that have now been revealed as lacking foundation. The government is simply wrong. Things have changed. Mr. Matta is crumbling under the weight of the decades of his punishment for these crimes, such that the legitimate goals of sentencing no longer support his continued incarceration. Accordingly, we ask for his release.

DATED: May 4, 2020

_____/s/_____
Mark Windsor
Counsel for Mr. Matta

_____/s/_____
Mark Adams
Counsel for Mr. Matta